# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 8, 2022

Lyle W. Cayce
Clerk

No. 20-70010

RONALD JEFFREY PRIBLE,

*Petitioner—Appellee*,

*versus*

BOBBY LUMPKIN, *Director*, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

*Respondent—Appellant*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:09-CV-1896

Before DENNIS, ELROD, and DUNCAN, *Circuit Judges*.*
STUART KYLE DUNCAN, *Circuit Judge*:

Early in the morning of April 24, 1999, Esteban "Steve" Herrera and
Nilda Tirado were shot to death in their Texas home. The killer doused
Tirado's partially nude body with accelerants and set her on fire. Fumes from
their mother's burning corpse asphyxiated the couple's three young

---

* JUDGE DENNIS concurs in the judgment only.

daughters, who were sleeping upstairs. The prime suspect was Ronald Jeffrey Prible, who was later indicted for capital murder.

A state jury heard evidence connecting Prible to the killings. Prible had been involved with Herrera in robbery and drug dealing. Prible was drinking and shooting pool in Herrera's garage on the night of the murders. Prible's semen was found in Tirado's mouth. And while in prison Prible confessed to the murders to Michael Beckcom, a murderer and repeat jailhouse snitch who admitted he was angling for a lower sentence in another case.

The jury convicted Prible and sentenced him to death. After a decade of federal proceedings, including extensive discovery and an evidentiary hearing, the district court issued Prible a writ of habeas corpus and granted him a new trial. We reverse.

## I. Background

### A. Murders and Investigation

In spring 1999, Prible and Herrera wanted to open a bar. To raise capital, Prible robbed banks and gave the proceeds to Herrera, who bought and sold drugs. Prible robbed six banks of about $46,000.

On the night of April 23, 1999, Herrera, his brother-in-law Victor Martinez, and Prible drank beer and shot pool in Herrera's garage. They went to a club and returned to Herrera's shortly after 2:00 a.m. They talked in the driveway as Herrera and Prible smoked marijuana. Sometime before 3:30 a.m., Martinez left, and Herrera and Prible returned to the garage to play pool.

Around 6:30 a.m., neighbors saw smoke pouring from Herrera's house and garage. They kicked open a door to the garage, found Herrera dead, face-down in a pool of blood, and called 9-1-1. First responders found Tirado dead, face-down on the couch in the den wearing only a t-shirt with

No. 20-70010

blood around her head. Her corpse was so burnt "it was hard to tell who she was." First responders also found the couple's three young daughters dead upstairs.

Prible immediately became a suspect. That day, police visited his parents' house, which was less than a mile away, and asked to speak with him. Prible accompanied police to the precinct, where he gave a DNA sample and two written statements. He first explained that he and Herrera played pool after Martinez left until about 4:00 a.m. when Tirado "came out into the garage and gave a look at [Herrera]." Prible "knew it was time to leave," so Herrera drove him to his parents' house, where he went directly to bed and slept until 1:30 p.m. But when asked, "[w]hat if some of your semen is in or on Nilda[?]," Prible changed his story. In his second statement, Prible said he and Tirado had sex and she performed oral sex on him in the bathroom while Herrera was outside. He said they had previously "mess[ed] around" and kissed a few times, but this was the first time they had sex. He did not initially tell the "entire story" to spare Tirado's reputation.

The ensuing investigation revealed no signs of forced entry. Herrera and Tirado were each executed with a close-range nine-millimeter gunshot to the back of the neck—which the medical examiner described as "assassin wound[s]." The bullets were fired from the same gun. The children died from soot and carbon monoxide inhalation.

Arson investigators determined a flashfire had been lit with accelerants in the den. They found next to Tirado's body a plastic gasoline container, a roll of paper towels soaked in an accelerant, an aerosol can, and a gallon-size metal can of Kutzit, an extremely flammable tile-glue solvent. They found more Kutzit cans in the garage and a storage shed behind the house. Tirado's burns indicated accelerants were poured on her and ignited after she was shot.

A consensual search of Prible's residence revealed guns, ammunition, a semi-automatic pistol magazine that did not fit any of the guns, and a pay stub for nine-millimeter ammunition. The magazine "could have" fit the murder weapon, and the pay-stub ammunition was consistent with the ammunition used to kill Herrera and Tirado.

Investigators examined the scene for "trace evidence," including blood, hair, and fingerprints. An arson investigator opined that the perpetrator could have traces of soot, smoke, or accelerants on his clothes, shoes, or skin. No such evidence linked Prible to the crime, however. And Prible had an alibi: a twelve-year-old next-door neighbor said she observed Prible and Herrera that night talking in Prible's driveway sometime after 1:00 a.m.

A swab of Tirado's mouth revealed sperm cells, the DNA of which matched Prible's. But Tirado's closest friends dismissed the notion of an affair. They claimed Tirado had recently told them that Prible "gave her the creeps," "[s]he didn't like him," and "she was tired of him being [at her home]."

## B. State Trial Proceedings

### 1. *The State's case*

A month after the murders, Prible pled guilty to bank robbery in federal court. He was sentenced to 63 months' imprisonment and sent to the Federal Correctional Complex in Beaumont, Texas. In May 2001, the court reduced his sentence to 36 months, setting his release for May 2002.

The State of Texas charged Prible with capital murder in July 2001. A Harris County grand jury indicted him in August 2001. Assistant District Attorneys Kelly Siegler and Vic Wisner tried the case a year later.

The State presented evidence at trial that: (1) Prible was the last person seen with Herrera at the house before the murders; (2) Prible and Herrera's struggling business venture supplied a motive; (3) the bullets that killed Herrera and Tirado were fired from the same gun; (4) Prible's semen was deposited in Tirado's mouth shortly before her death; (5) a fire was set to destroy physical evidence, including Prible's DNA; and (6) Prible admitted to fellow inmate Michael Beckcom that he committed the murders. *Prible v. State*, 175 S.W.3d 724, 730 (Tex. Crim. App. 2005). Prible's claims in this habeas action center around Beckcom's testimony and the semen-DNA evidence. We describe that testimony and evidence in detail below.

### 2. *Beckcom's testimony*

At trial, Beckcom testified to his lengthy criminal history, including his murder of a federal witness. He explained that he had testified in several cases for sentence reductions and was testifying against Prible in exchange for Siegler's writing a letter to his prosecutor in California. He had been placed in protective custody once word spread that he was testifying against Prible.

Beckcom described the nature of his relationship with the prosecution as an informant. He learned of Siegler through his cellmate, Nathan Foreman, and first contacted her about Prible's case in October 2001. Beckcom understood from their conversation that "the only way for [Siegler] to be interested" was if he knew "[s]pecifics about the case, facts." So Beckcom "sought to find out as much as [he] could." After Prible confessed to him, Beckcom and Siegler met for about an hour in early December 2001. He gave her a letter with the information he had. They spoke "[t]wo or three times" thereafter about Siegler's recommending a sentence reduction.

Beckcom testified that he and Foreman met Prible through a shared acquaintance and the three eventually became close friends. They engaged in

No. 20-70010

"general conversation" before Prible asked about Beckcom's murder case. Prible slowly began to offer details of his own case "in bits and pieces of conversations." Prible mentioned police found his DNA on Tirado but "[e]verybody knew they were messing around." When Beckcom asked about the murder weapon, Prible replied, "asphalt's good some times for hiding things." Prible emphasized his service in the Marine Corps and implied he would murder for hire. As they grew closer, Beckcom asked more direct questions. Prible "softened up a little bit" and shared more details after Beckcom said he did not care if Prible committed the murders.

Prible confessed to Beckcom and Foreman on November 24, 2001. He described how during an argument he shot Herrera, Tirado ran into the den to call the police, Prible followed and shot her too, and then he set a fire "to cover his tracks." Prible explained, "[Herrera] took $250,000 of my hard-earned money" and "was going to kill me, so I handled my business." Prible looked in the house for the drug money, "but it wasn't there." When asked how he got in and out without being seen, Prible said "his parents lived a couple miles from there so it wasn't far." Referring to his military service, he added, "it was a high intensive, low drag maneuver. That's what I was trained for, in and out. I'm a ghost." Prible continued, "Anybody that can go in a house and take out a whole family and get out without being seen is a bad mother fucker and I'm that mother fucker." To corroborate Beckcom's relationship with Prible, the State introduced a photograph of Prible, Beckcom, and Foreman in the Beaumont visiting room the day Prible confessed.

The defense cross-examined Beckcom about his criminal record and history as an informant. Beckcom maintained that he learned the details of the crime only through Prible. A character witness doubted Prible confided in Beckcom because everyone in Beaumont, including Prible, knew Beckcom would snitch "falsely or truly" to help himself. A jailhouse lawyer testified

6

that Prible showed his probable-cause affidavit to several inmates at Beaumont: "He talked about his case so much. I told him people would come in and testify against him if he kept that stuff up. And 'lo and behold.'"

### 3. *Semen-DNA testimony*

Three witnesses testified about the semen in Tirado's mouth. Dr. Joye Carter, chief Harris County medical examiner, testified for the State that sperm can be found in a person's mouth "several hours" after ejaculation. She opined that it was unlikely, but possible, that the semen was deposited in Tirado's mouth after she died. She saw "no indication" of sexual assault.

Bill Watson, a PhD student who performed the DNA testing on the sperm cells, testified for the State that his ability to generate a full male DNA profile from the oral swab was "consistent with there being a great deal of sperm present." It was also "consistent with the male depositing the semen in [Tirado]'s mouth moments, if not seconds, before she was killed." He opined that the sperm was likely deposited within the hour before Tirado died.

Dr. Robert Benjamin, Watson's PhD advisor, testified for Prible. He said it was not "possible to extrapolate" from the "amount of DNA" found "roughly what time [it] was placed there." He warned such estimates are "dangerous," "hazardous," and "not scientifically valid." He claimed "no controlled scientific studies" supported Watson's opinion.

### 4. *Closing arguments*

The State relied on Beckcom's testimony and the semen-DNA evidence in closing arguments. Wisner claimed "Beckcom is telling the truth" but maintained the State "ha[s] enough evidence without him." He emphasized that Beckcom testified to details beyond Prible's probable-cause

No. 20-70010

affidavit, debunking theories that Beckcom learned facts from the affidavit or the prosecutors "fed him the information." Citing Watson's testimony, Wisner submitted, "There is no way in the world that th[e] semen wasn't deposited either moments before or seconds after [Tirado] died."

The defense attacked Beckcom's credibility, calling him a "self-admitting liar" and "snitch." The defense claimed Beckcom could have learned details about the case in talking with Siegler. Citing Dr. Carter's testimony, the defense argued the sperm in Tirado's mouth could have been deposited several hours before her death.

Siegler's rebuttal pressed, *inter alia*, the semen-DNA evidence and Beckcom's testimony: "if Jeff Prible had managed to control his ejaculation and his mouth, he might not have ever been caught." She submitted that Prible forced Tirado to perform oral sex on him at gunpoint before he killed her. She acknowledged a "deal [was] cut" with Beckcom but argued the jury could convict without believing him.

### 5. *Conviction and sentence*

The jury convicted Prible of capital murder. In accordance with the jury's answers to special issues, the court sentenced Prible to death. *See* Tex. Code Crim. Proc. Ann. art. 37.071 § 2. The Court of Criminal Appeals (CCA) affirmed. *Prible*, 175 S.W.3d 724, *cert. denied*, *Prible v. Texas*, 546 U.S. 962 (2005).

### C. State and Federal Habeas Proceedings

### 1. *State habeas and* pro se *filings*

In November 2004, Prible filed a counseled state habeas application, claiming ineffective assistance of trial counsel and that the jury did not reflect a fair cross-section of the community. He did not challenge Beckcom's

8

testimony, allege prosecutorial misconduct, or otherwise raise informant issues.

During the proceedings, Prible inundated the CCA with *pro se* filings. In November 2005, he filed a *pro se* "supplemental writ," asserting, *inter alia*, a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), based on Siegler's conspiring with Beckcom, Foreman, Larry Wayne Walker, and other inmates to offer false testimony against him and another Beaumont inmate, Hermilio Herrero. Weeks later, he filed a letter stating that he had misidentified Larry Wayne for Carl Walker Jr. Prible's counsel, Roland B. Moore III, discouraged Prible from pressing the informant conspiracy theory. He wrote in a letter to Prible that nothing "anybody could say . . . would help. . . . [Even] if the ideal witness came forward . . . nobody would believe it. I mean nobody." Moore advised Prible's sister in an e-mail that the conspiracy claim was meritless absent a recantation from Beckcom. Subsequent *pro se* filings and correspondence—including requests for an evidentiary hearing and production of the prosecutors' e-mails—fleshed out the conspiracy theory. Prible repeatedly complained of Moore's representation. In May 2007, the CCA responded to a *pro se* filing, advising Prible to address the matter to his attorney because the CCA "does not recognize hybrid representation."

In June 2007, Prible filed *pro se* a second state habeas application, asserting claims under *Brady* and *Massiah v. United States*, 377 U.S. 201 (1964). He claimed Siegler "hid her true ties" to Beckcom and other informants, who conspired to "give false testimony for time reduction[s]." He also claimed Siegler incentivized Beckcom to "get close to Prible and find any information that would aid her in making her case" by offering to write a sentence-reduction letter to Beckcom's prosecutor. Prible argued he satisfied the standard for filing a successive application. *See* Tex. Code Crim. Proc. Ann. art. 11.071 § 5.

No. 20-70010

In August 2007, Prible filed *pro se* a third state habeas application, claiming trial counsel was ineffective for failing to interview Herrero. Prible claimed Siegler prosecuted Herrero a month before him using "the same group of jailhouse informants." Prible alleged his trial counsel knew of this ring of informants but did nothing.

The CCA denied Prible's counseled application on the merits. *Ex parte Prible*, Nos. WR–69,328–01, WR–69,328–02, WR–69,328–03, 2008 WL 2487786, at *1 (Tex. Crim. App. June 18, 2008) (per curiam). It construed Prible's two later *pro se* applications as "subsequent applications," found that they did not "contain[] sufficient specific facts . . . [to] meet[] one of the exceptions set out in Art. 11.071, § 5," and dismissed them as abuses of the writ. *Ibid.* (citing TEX. CODE CRIM. PROC. ANN. art. 11.071 § 5).

Moore advised Prible that he "would not be adopting" the *pro se* application because "[n]one of it [wa]s useful." Prible wrote to the CCA, with Moore's letter attached, arguing "I did not, and will not be asking [Moore's] permission for [the application] to be added to my writ."

### 2. *Initial federal habeas petitions, subsequent state habeas filings, and state evidentiary hearing*

In June 2009, Prible timely filed a counseled federal habeas petition. He quickly amended it to add supporting affidavits as exhibits. The amended petition asserted eight claims, four of which related to the State's development and use of inmate testimony, including a *Brady* claim and a *Massiah* claim. Respondent argued the four claims were defaulted because they were unexhausted (*i.e.*, Prible did not present them in state court) and the state court would now reject them as abusive. The district court stayed the case to allow Prible to seek review of the claims in state court.

In September 2010, Prible filed a counseled, fourth state habeas application, asserting his *Brady* and *Massiah* claims. He claimed he obtained

"insider information" from Carl Walker. Walker stated, *inter alia*, that Beckcom and Foreman recruited him to inform on Prible, Siegler fed details of Prible's case to Foreman before Prible arrived at Beaumont, the photograph with Prible was staged, and Siegler orchestrated similar informant schemes in other murder cases. Prible argued his application should not be barred as successive because this new evidence was unavailable when he filed his first state habeas application.

The trial court sent Prible's fourth application to the CCA because it was successive. The CCA could not determine "whether the factual basis for the[] claims was unavailable on the dates that [Prible] filed his previous applications." *Ex parte Prible*, No. WR–69,328–04, 2010 WL 5185846, at *1 (Tex. Crim. App. Dec. 15, 2010) (per curiam). It remanded the matter so the "record c[ould] be supplemented with evidence relating to . . . when and how [Prible] obtained the evidence at issue and whether he exercised reasonable diligence to obtain this evidence at the earliest opportunity." *Ibid.*

In February 2011, Prible moved the state court for *in camera* review of privileged work product in the State's trial file. The State did not oppose the motion and produced letters to Siegler from Beaumont inmates Carl Walker, Jesse Gonzalez, and Mark Martinez, which the State had sealed, designated as "attorney work product," and not produced. In the letters, the inmates claimed Prible shared details of the crime while in prison and expressed a willingness to testify for "help" with their sentences.

The state trial court held an evidentiary hearing in June 2011. Moore testified that Prible told him "a [black] man named Walker" had information about Siegler's ring of informants at Beaumont before he filed the initial state habeas application. With little information on Walker, Moore considered the task of locating him "impossible" and "a complete fool's errand." Moore did not call or visit Beaumont, employ an investigator, issue a subpoena, seek

No. 20-70010

a court order to obtain information, or attempt to contact any inmates named Walker. Moore never spoke with Beckcom because his lawyer said he would not talk. Moore contacted Foreman, but he refused to talk. And despite Prible properly identifying Carl Walker and attempting to assert *Brady* and *Massiah* claims in his *pro se* applications, Moore did not seek to supplement or amend the initial application because he "did not feel [he] had adequate information" and "it would just be . . . harmful to Mr. Prible in the long run."

In its findings of fact, the trial court held Prible's fourth application was barred under article 11.071, section 5(a)(1), because Prible "fail[ed] to establish that the factual basis for his claims was unavailable on the dates that [he] filed his three previous applications." It found Walker's statements were "unpersuasive and ha[d] little evidentiary value" because they "consist[ed] almost entirely of hearsay and speculation and contain[ed] no direct evidence of [Prible's] conspiracy theory." It also found that although Moore had "very limited information regarding the identity of Walker" and had "investigated [Prible's] conspiracy theory," the factual basis for Prible's claims was available when he filed the initial application. It further found that the factual basis for the claims was available when Prible filed his *pro se* applications because they "explicitly raised the conspiracy theory," "identified witness Walker by name and federal inmate register number," and "indicated . . . that a witness had contacted [Prible's] trial counsel." The CCA affirmed and dismissed the fourth application as an abuse of the writ. *Ex parte Prible*, No. WR-69,328-04, 2011 WL 5221864, at *1 (Tex. Crim. App. Nov. 2, 2011) (per curiam).

### 3. *Subsequent federal habeas petitions and federal discovery*

In August 2012, Prible filed a second amended petition back in federal court. In November 2013, the district court granted Prible's opposed motion

No. 20-70010

for discovery to subpoena records from state and federal agencies. Prible filed a third amended petition in September 2015. The court granted Prible's opposed discovery motions to subpoena additional records; to depose Siegler, Wisner, Foreman, Beckcom, Walker, and Bureau of Prisons personnel, among others; and to compel production of the prosecution's "Work Product" files and e-mails after *in camera* review.

In March 2018, Prible filed a fourth amended petition—the operative petition. He alleged the State failed to disclose that Siegler received letters from informants about Prible; met with Beckcom, Foreman, and other informants months before Prible's trial; used these informants in Herrero's case; and wrote sentence-reduction letters for them. Prible also alleged the State failed to disclose that Pam McInnis, head of the Harris County crime lab, had told Siegler semen could live in an oral cavity for up to seventy-two hours, evidenced by a note discovered in the State's work-product folder. Prible asserted sixteen claims. Relevant here are claims two, three, four, five, six, and ten, which boil down to (1) ring-of-informants *Brady* claims, (2) a *Massiah* claim relating to Beckcom, and (3) a semen-DNA *Brady* claim.[1]

Respondent answered and moved for summary judgment. Prible cross-moved for an evidentiary hearing on Respondent's arguments that

---

[1] Specifically, those claims are: (2) the State suppressed evidence that Beckcom and Foreman were part of an organized attempt to fabricate a false confession in exchange for leniency (*Brady*); (3) the State suppressed evidence that Foreman gave a fabricated account different from Beckcom's (*Brady*); (4) the State suppressed evidence impeaching Beckcom's testimony about the circumstances of Prible's confession (*Brady*); (5) the State suppressed evidence the trial court had ordered produced (*Brady*); (6) the State employed Beckcom as a state agent to elicit incriminating statements from Prible (*Massiah*); and (10) the State suppressed evidence that McInnis advised Siegler that semen could survive seventy-two hours in an oral cavity (*Brady*).

Prible's claims are time-barred, unexhausted, and procedurally defaulted and on the merits of the claims. The court granted Prible's cross-motion.

### 4. *Federal evidentiary hearing*

At the three-day evidentiary hearing, the court heard testimony from Foreman, Walker, Beckcom, Siegler, and others. Foreman testified that he first learned facts about Prible's case in 2001 from inmate Jesse Moreno. Foreman, Beckcom, Moreno, and another inmate then contacted Siegler. In August 2001, Foreman met with Siegler about Prible, but he could not remember the content of the conversation. Foreman said Prible "didn't really talk about" his offenses and certainly never confessed to the murders. The court found Foreman credible. *Prible v. Davis*, No. H-09-CV-1896, 2020 WL 2563544, at *15 (S.D. Tex. May 20, 2020).

Walker testified that he learned "a plethora of information" about Prible's case from Foreman, Beckcom, and inmate Oscar Gonzalez before he met Prible. The group suggested Walker testify against Prible to get a sentence reduction. They "strategized" to befriend Prible and to send letters to the prosecutor asking to be witnesses. Walker said the group staged the photograph with Prible to create a perception that they had a "close connection." Walker sent his letter to Siegler offering to testify that Prible had confessed. He said the group sent the letters to "corroborate each other's story." To Walker's knowledge, "Prible never confessed." The court found Walker credible. *Id.* at *16.

Beckcom testified that he learned about Siegler from Foreman and called her to discuss a possible sentence reduction. Beckcom said he took notes on what Prible said to memorialize the information "Siegler asked [him] to get." Beckcom testified that during his experience as an informant, no prosecutor, including Siegler, ever fed him details about a crime. Beckcom and Foreman discussed "trying to get a confession" from Prible, but

Foreman never gave him information about Prible's case. Beckcom claimed Foreman was present when Prible confessed. Siegler led Beckcom to believe he would receive a significant time-cut for his testimony. Despite recognizing Beckcom's testimony was supported by the record, the court found, without explanation, that "Beckcom was not a credible witness" and "it [wa]s obvious that Beckcom was dishonest when it suited his needs." *Id.* at *18.

Siegler testified that her August 2001 meeting with Foreman was unrelated to her decision to seek an indictment. She said Foreman later tried calling her, but she "knew he was a liar." Siegler maintained she did not need to disclose her contacts with Foreman because he "was not a witness" at trial. Siegler recalled receiving the letters from Walker, Martinez, and Gonzalez but claimed she did not believe their accounts. She said they were in her file available to the defense. She remembered speaking to McInnis but could not recall if she relayed that conversation to the defense. The court found Siegler "was not credible on both minor and major points," highlighting inaccuracies in her testimony and noting she was "combative in demeanor and did not appear forthcoming." *Id.* at *19.

### 5. *District court grant of habeas relief*

In May 2020, the district court granted habeas relief on Prible's ring-of-informants *Brady* claims, his *Massiah* claim relating to Beckcom, and his semen-DNA *Brady* claim. *Id.* at *43; *see supra* note 1. The district court held Prible showed cause and prejudice to excuse the procedural default of his claims. *Prible*, 2020 WL 2563544, at *23, *37. As to cause, the court explained that Siegler suppressed evidence of her relationships with the informants and the McInnis note, that the informant evidence from Walker "was not available" to Prible "despite his diligent attempts to discover it," and that Prible and Moore had no reason to know Siegler suppressed evidence. *Id.* at *24–27, *37. As to prejudice, the court reasoned that "the suppressed

No. 20-70010

evidence taken as a whole would have allowed the defense to seriously undercut" the veracity of Beckcom's testimony and the State's theory that Prible deposited his semen in Tirado's mouth shortly before her death. *Id.* at *33–35, *39. The court held Prible established *Brady* violations because the suppressed evidence was favorable to him, *id.* at *27–35, and a *Massiah* violation because Beckcom deliberately elicited the confession while acting as a state agent, *id.* at *38–39. Respondent timely appealed.

## II. Standard of Review

In reviewing a grant of habeas relief, we review issues of law *de novo* and findings of fact for clear error. *Hughes v. Vannoy*, 7 F.4th 380, 386 (5th Cir. 2021) (citation omitted). Whether a petitioner has shown cause and prejudice to excuse a procedural default is reviewed *de novo. See Gonzalez v. Thaler*, 623 F.3d 222, 224 (5th Cir. 2010) (citation omitted).

## III. Discussion

Respondent challenges the grant of habeas relief on the grounds that (1) Prible has not overcome the procedural default of his claims, (2) 28 U.S.C. § 2254(e)(2) bars new evidence, and (3) Prible's claims fail on the merits. Because we conclude Prible has not overcome procedural default, we do not reach the latter two points.[2]

---

[2] The Supreme Court recently explained that, under section 2254(e)(2), a court improperly holds an evidentiary hearing or considers new evidence to determine whether cause and prejudice exist to overcome procedural default "if the newly developed evidence never would 'entitle the prisoner to federal habeas relief.'" *Shinn v. Ramirez*, 142 S Ct. 1718, 1739 (2022) (alteration omitted) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)). Because we conclude Prible has not overcome procedural default even on the expanded record developed below and thus do not reach Respondent's section 2254(e)(2) arguments or the merits of Prible's claims, we express no view on the district court's decision to hold a hearing and consider new evidence.

No. 20-70010

## A. Cause and Prejudice Standards

We may not review the merits of procedurally defaulted claims absent a showing of cause and prejudice to excuse the default. *Dretke v. Haley*, 541 U.S. 386, 388 (2004); *Hughes v. Quarterman*, 530 F.3d 336, 341 (5th Cir. 2008); *accord Shinn v. Ramirez*, 142 S. Ct. 1718, 1732 (2022). Cause exists when "some objective factor external to the defense impeded counsel's efforts to raise the claim in state court." *Canales v. Stephens*, 765 F.3d 551, 562 (5th Cir. 2014) (quoting *McCleskey v. Zant*, 499 U.S. 467, 493 (1991)). "A factor is external to the defense if it 'cannot fairly be attributed to' the prisoner." *Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017) (quoting *Coleman v. Thompson*, 501 U.S. 722, 753 (1991)).

It is well established that "a failure to raise a claim in an earlier habeas petition may not be excused for cause 'if the claim was reasonably available' at the time of the first petition." *Ford v. Davis*, 910 F.3d 232, 237 (5th Cir. 2018) (quoting *Fearance v. Scott*, 56 F.3d 633, 636 (5th Cir. 1995)); *see also Canales*, 765 F.3d at 562 (noting cause exists where "the factual or legal basis for a claim was not reasonably available to counsel" (quoting *McCleskey*, 499 U.S. at 494)). The cause requirement "is based on the principle that petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first . . . habeas petition." *McCleskey*, 499 U.S. at 498.[3] Cause can exist where "interference" by state officials makes it "impracticable" to raise the claim in state court. *Canales*, 765 F.3d at 562 (quoting *McCleskey*, 499 U.S. at 494); *see also Banks v. Dretke*,

---

[3] *See also* Brian R. Means, Federal Habeas Manual § 9B:51, Westlaw (database updated May 2022); 2 Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice and Procedure § 26.3[b] n.28, LexisNexis (database updated Dec. 2021) (collecting cases).

17

540 U.S. 668, 691 (2004) (noting "the State's suppression of the relevant evidence" can be cause).

As to prejudice, the petitioner must show that the errors "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Smith v. Quarterman*, 515 F.3d 392, 403 (5th Cir. 2008) (quoting *Murray v. Carrier*, 477 U.S. 478, 493 (1986)); *see also* Hertz & Liebman, *supra* note 3, § 26.3[c]. Courts need not consider prejudice if the petitioner fails to show cause, and vice versa. *Matchett v. Dretke*, 380 F.3d 844, 849 (5th Cir. 2004) (citing *Rodriguez v. Johnson*, 104 F.3d 694, 697 (5th Cir. 1997)); *see Murray*, 477 U.S. at 494.

"A *Brady* violation can provide cause and prejudice to overcome a procedural bar on a habeas claim" because "cause and prejudice parallel two of the three components of the alleged *Brady* violation itself." *Guidry v. Lumpkin*, 2 F.4th 472, 486 (5th Cir. 2021) (first quoting *Thompson v. Davis*, 916 F.3d 444, 455 (5th Cir. 2019); then quoting *Strickler v. Greene*, 527 U.S. 263, 282 (1999)). The three components of a *Brady* violation are (1) "the evidence at issue is favorable to the defense, either because it is exculpatory or impeaching," (2) "the prosecution suppressed the evidence" (cause), and (3) "the evidence is material" (prejudice). *Murphy v. Davis*, 901 F.3d 578, 597 (5th Cir. 2018) (citing *United States v. Brown*, 650 F.3d 581, 587–88 (5th Cir. 2011)). A "*Brady* claim fails if the suppressed evidence was discoverable through reasonable due diligence." *Guidry*, 2 F.4th at 487 (quoting *Reed v. Stephens*, 739 F.3d 753, 781 (5th Cir. 2014)).

In reviewing habeas claims, we presume a state court's findings of fact are correct unless the petitioner rebuts this presumption with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "This deference extends not only to express findings of fact, but to the implicit findings of the state court." *Ford*, 910 F.3d at 234–35 (quoting *Garcia v. Quarterman*, 454 F.3d 441, 444

No. 20-70010

(5th Cir. 2006)). A state trial court's findings "survive an appellate court's review" if they were "adopted" or "incorporated into the appellate court's peremptory denial of relief." *Murphy*, 901 F.3d at 595 (quoting *Williams v. Quarterman*, 551 F.3d 352, 358 (5th Cir. 2008)).

## B. Ring-of-Informants *Brady* Claims

We first consider Prible's ring-of-informants *Brady* claims (claims two, three, four, and five).[4] The district court held that these claims are defaulted[5] but that Prible showed cause and prejudice to overcome the bar.

---

[4] While Prible does not dispute that these claims are defaulted, he argues Respondent waived the argument that he did not show cause for the default by addressing claims two, three, four, and five together as if they "reduce to a single ring of informants claim." We disagree. The district court addressed the claims together because they "share a common core of operative facts." *Prible*, 2020 WL 2563544, at *21–23. Absent that finding, claims three, four, and five could not relate back to the original federal petition (claim two) and thus would have been time-barred. *See id.* at *21–23, *40 n.25. Prible cannot have it both ways: he cannot rely on relation-back doctrine below to overcome timeliness issues and now argue the claims are so factually distinguishable to require separate cause analyses. *See Mayle v. Felix*, 545 U.S. 644, 657 (2005). We accordingly assess the default of the four ring-of-informants *Brady* claims together.

[5] We agree that these claims are defaulted. A federal habeas claim is defaulted when either the state court denied a claim based on an adequate and independent state procedural rule, *Rocha v. Thaler*, 626 F.3d 815, 820 (5th Cir. 2010) (quoting *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997)), or the claim is unexhausted and the state court would now find it procedurally barred, *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001) (citing *Sones v. Hargett*, 61 F.3d 410, 416 (5th Cir. 1995)). The state court dismissed claim two under Texas's abuse-of-the-writ doctrine, "a valid state procedural bar foreclosing federal habeas review." *Coleman v. Quarterman*, 456 F.3d 537, 542 (5th Cir. 2006) (citing *Kunkle v. Dretke*, 352 F.3d 980, 988–89 (5th Cir. 2003)). Prible did not raise claims three, four, and five in state court, so they are unexhausted. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 842–48 (1999). But given the state court's finding that the factual basis for Prible's ring-of-informants theory was available when Prible filed his first three state habeas applications, the state court would now find these claims procedurally barred. *See Finley*, 243 F.3d at 220.

19

No. 20-70010

*Prible*, 2020 WL 2563544, at *24–27. We disagree. Prible has not shown the factual basis for these claims was unavailable and so cannot establish cause.

We begin with the findings made by the state trial court on remand from the CCA. The court determined that the factual basis for the ring-of-informant claims was "available when [Prible's] initial habeas petition was filed in November[] 2004" and "at the time of the filing of [Prible's] second subsequent application." The court's factual findings formed the basis of the CCA's denial of relief, *Prible*, 2011 WL 5221864, at *1, and thus survived appellate review, *see Murphy*, 901 F.3d at 595. The findings are accordingly presumed correct unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Ford*, 910 F.3d at 235; *see also Romero v. Davis*, 813 F. App'x 930, 933 (5th Cir. 2020) (per curiam).

The district court held that Prible rebutted this finding. Specifically, it found that the claims' factual basis was unavailable when Prible filed his state habeas applications because Siegler suppressed "notes memorializing meetings with Foreman and Beckcom" and the "letters from several inmates—including Walker—trying to inform on Prible." *Prible*, 2020 WL 2563544, at *24 n.20, *25–27. The court concluded that Siegler's suppressing these items "left Prible with no concrete evidence to support [his] claim[s] during [state] proceedings, despite Prible and [Moore's] diligent efforts to discover such evidence." *Id.* at *26.

We disagree. The record confirms the state court's finding that the factual basis for the ring-of-informants claims was available before Moore filed Prible's initial state habeas application. In his November 2005 *pro se* "supplemental writ," Prible alleged a *Brady* violation based on Siegler's purportedly conspiring with several Beaumont informants to present false testimony that Prible had confessed. Prible claimed that he had "told his attorneys about all of these issues numerous times" and he "believe[d] that

these issues should of [*sic*] been in his original writ." In a July 2006 *pro se* letter, Prible claimed information regarding Walker and the ring of informants was brought to his attention "over 3 years ago," meaning he was aware of the factual basis for the claims sometime in 2003—a year before Moore filed the initial application. And in his third state habeas application filed *pro se* in August 2007, Prible claimed Moore knew about the ring of informants "before he did my brief" but "never put it in my appeal." Moreover, Moore testified at the state evidentiary hearing that Prible had advised him of the ring-of-informants allegation *before* he filed the initial application.

In finding cause, the district court conflated availability of the factual basis for Prible's ring-of-informants claims with access to evidence supporting them. *See McCleskey*, 499 U.S. at 498 (noting district court erroneously conflated "[w]hether petitioner knew about or could have discovered the 21–page document" and "whether he knew about or could have discovered the evidence the document recounted"). In assessing the availability of a claim's factual basis, "the question is whether petitioner possessed, or by reasonable means could have obtained, a sufficient basis to allege a claim in the first petition and pursue the matter through the habeas process." *Ibid.* (citing Rules Governing Section 2254 Cases in the U.S. Dist. Cts., Rules 6 (Discovery), 7 (Expanding the Record), and 8 (Evidentiary Hearing)). "Omission of the claim will not be excused merely because evidence discovered later might also have supported or strengthened the claim." *Ibid.*

Our decision in *Robison v. Johnson*, 151 F.3d 256 (5th Cir. 1998), is instructive. Robison defaulted on his claim that trial counsel was ineffective for not following instructions Robison provided in a letter. *Id.* at 262. Robison argued that he showed cause because his habeas attorney did not have the letter when he filed his initial state habeas petition. *Id.* at 263. We rejected

this argument, reasoning "[i]t was Robison's instructions, however communicated, and not the letter itself, that form[ed] the 'factual basis of the claim.'" *Ibid.* (quoting *United States v. Guerra*, 94 F.3d 989, 993 (5th Cir. 1996)). Because "Robison was obviously aware of the letter and of the instructions . . . therein," he "knew of the factual basis of the claim before his current counsel's discovery of the letter." *Ibid.* We explained Robison's inability "to produce the best evidence of this communication until later does not constitute cause for the delay in bringing [the] claim." *Ibid.*

Similarly, here it was Siegler's alleged efforts to conspire with Beaumont informants to present false testimony, not her meeting notes or the inmates' letters, that formed the factual basis for Prible's ring-of-informants claims. Prible professed knowledge of these efforts long before he obtained the notes and letters. His inability to produce these items—the "best evidence" of the ring—is not cause for his delay in asserting the claims. *See McCleskey*, 499 U.S. at 498; *Robison*, 151 F.3d at 263. Prible's lack of "concrete evidence to support [his] claim[s]," *Prible*, 2020 WL 2563544, at *26, did not make their factual basis unavailable. Prible could have asserted the claims in his initial application and then acquired supporting evidence through state habeas proceedings. *See McCleskey*, 499 U.S. at 498; *see also, e.g.*, *Hall v. Thaler*, No. EP-10-CV-135-FM, 2011 WL 13185739, at *16, *31, *33–34 (W.D. Tex. Dec. 20, 2011) (explaining petitioner filed a "skeletal state habeas corpus application," asserting grounds for relief in "rather cryptic terms" that "did not allege any specific facts in support," and then developed claims at an evidentiary hearing).

But Prible's cause argument would fail even if we assume his preexisting knowledge did not provide a basis for asserting the ring-of-informants claims initially. Prible still cannot show cause because "other known or discoverable evidence could have supported the claim in any event." *McCleskey*, 499 U.S. at 497. Contrary to the district court's view,

Siegler's failure to disclose her ties with Beaumont informants did not make the factual basis for Prible's informants claims "unavailable." There is no "suppression," and thus no cause, where facts are "available from other sources" or "can be discovered by exercising due diligence." *Rector v. Johnson*, 120 F.3d 551, 558–59 (5th Cir. 1997) (collecting cases). Here, factual support for these claims was available from another source known to Prible—Walker—but Prible did not diligently pursue it.[6]

Prible knew Walker might have information about the alleged conspiracy before he filed his initial state habeas application. Prible told Moore that a black man named Walker "was privy to the activities of [Siegler] with respect to this group of cooperating inmates" and to "what efforts were being made to recruit witnesses against Mr. Prible in federal prison." Walker was willing to share information about, *inter alia*, the letters to Siegler, the specific inmates involved, the alleged plot against Herrero, and his belief Siegler was "feeding them the information." As the district court recognized, Prible's claims "relied heavily" on information from Walker. *Prible*, 2020 WL 2563544, at *10.

But Moore did not diligently pursue Walker or otherwise investigate Prible's ring-of-informants story. Moore tried to interview Foreman, who declined to talk, but that was it. Moore did not look for Walker because he considered it "a complete fool's errand." He did not call, visit, or send an investigator to Beaumont because he "firmly believe[d]" "it would be a complete waste of time" and the Bureau of Prisons "would not do anything

---

[6] The district court emphasized that Siegler did not disclose her contacts with Foreman in response to pretrial *Brady* motions. *Prible*, 2020 WL 2563544, at *26. That is mistaken. The evidence Siegler did not disclose fell outside those motions, which related to Beckcom and "any State witnesses." Foreman and other Beaumont inmates with whom Siegler allegedly conspired were not "witnesses" in Prible's trial.

for [him] without something more." He did not issue a subpoena or seek assistance from the state court for the same reasons. He also did not attempt to speak with Beckcom because he thought Beckcom would not talk.[7] Moore's lack of diligence in failing to purse the ring-of-informants *Brady* claims is "chargeable" to Prible. *Holland v. Jackson*, 542 U.S. 649, 653 (2004) (per curiam). And it precludes finding cause to excuse Prible's default. *See Coleman*, 501 U.S. at 753 (explaining counsel's negligence "is not 'cause' because the attorney is the petitioner's agent . . . and the petitioner must 'bear the risk of attorney error'" (collecting cases)).

The district court found that Moore made "diligent attempts" to investigate the ring of informants. *Prible*, 2020 WL 2563544, at *26. We disagree. The court overlooked the fact that Moore consciously failed to pursue Walker despite knowing he might have key information. *See Henderson v. Cockrell*, 333 F.3d 592, 606–07 (5th Cir. 2003) (finding

---

[7] The record plainly shows Moore was skeptical of Prible's theory from the beginning. In a September 2005 e-mail to Prible's sister, Moore wrote that "testimony about a 'conspiracy' is not relevant" absent a recantation from Beckcom, who Moore thought was "a reliable snitch." In a July 2006 e-mail, Moore told her it was not worth revisiting informant issues because "[n]o one would believe it" and "Beckhom [*sic*] is not going to retract what he said." In a July 2006 letter, Moore dissuaded Prible from pushing the conspiracy theory because he thought "nobody would believe it." And when Prible filed *pro se* a second state habeas application asserting the ring-of-informants claims, Moore refused to adopt it, believing "[n]one of it [wa]s useful." At the state evidentiary hearing, Moore testified he did not believe Prible and viewed him as the "typical inmate who says things all the time." Only once the State produced the inmates' letters to Siegler did Moore think "there's some credence to be given to what [Prible was] saying." But even assuming Moore erred in failing to trust Prible, it would not create cause. *See Coleman*, 501 U.S. at 753 (explaining "[a]ttorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation" (collecting cases)). And while the letters may have provided "some evidence" corroborating Prible's story, as explained above, the factual basis for Prible's claims was available long before Prible obtained the letters. *See McCleskey*, 499 U.S. at 498; *Robison*, 151 F.3d at 263.

No. 20-70010

undebatable district court's finding of no cause where "evidence showed a lack of due diligence on the part of [petitioner's] initial state habeas counsel, who made no attempt to interview [a lead witness]").[8]

The district court credited Moore's belief that finding Walker was "a fool's errand." *Prible*, 2020 WL 2563544, at *26. And Prible maintains that efforts to find Walker would have been in vain. But we cannot assume that to be so. Diligence "depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend . . . upon whether those efforts could have been successful." *Williams v. Taylor*, 529 U.S. 420, 433, 435 (2000) (applying diligence standard for "failing to properly assert a federal claim in state court" to 28 U.S.C. § 2254(e)(2)); *see Henderson*, 333 F.3d at 607 (rejecting argument that witness would not have talked even if counsel had tried to interview him). While locating Walker may have seemed unlikely to Moore, it was incumbent on Moore to try.

Prible claims he was diligent because he personally raised the informant issues in his *pro se* filings. But he did so *after* filing the initial state habeas application. In any event, Prible's *pro se* efforts are irrelevant because they

---

[8] *See also Osborne v. Purkett*, 411 F.3d 911, 916 (8th Cir. 2005) (finding no due diligence where counsel learned rape victim had sex with her boyfriend before forensic examination but did not interview the boyfriend or fully investigate their relationship); *Hutchison v. Bell*, 303 F.3d 720, 748 (6th Cir. 2002) (finding no due diligence where petitioner failed to investigate claims despite "aware[ness]" that an individual "possessed relevant information"); *Barnes v. Thompson*, 58 F.3d 971, 976–77 (4th Cir. 1995) (deferring to state court's finding that claim was available prior to filing state habeas petition because record showed reasonably diligent counsel could have obtained underlying facts by interviewing witnesses); *Sterling v. Cockrell*, No. Civ.A. 3:01–CV–2280, 2003 WL 21488632, at *51–52 (N.D. Tex. Apr. 23, 2003) (Fitzwater, J.) (finding no cause for default due to lack of diligence where, *inter alia*, petitioner "ha[d] not demonstrated that his habeas counsel made any effort to interview Deputy Jones or to investigate further his statements").

25

were procedurally improper. *See Ramirez*, 2022 WL 1611786, at *7 (alteration omitted) (noting doctrine of procedural default requires claims be "presented to the state courts 'consistent with the State's own procedural rules'" (quoting *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000))); *Dupuy v. Butler*, 837 F.2d 699, 702 (5th Cir. 1988) (noting, for exhaustion purposes, the habeas applicant must "present his claims before the [state] courts in a procedurally proper manner according to the rules of the state courts" (quoting *Carter v. Estelle*, 677 F.2d 427, 443 (5th Cir. 1982))). As it advised Prible, the CCA does not recognize hybrid representation. *See Landers v. State*, 550 S.W.2d 272, 279–80 (Tex. Crim. App. 1977).[9]

In short, Prible "possessed, or by reasonable means could have obtained, a sufficient basis to allege [the ring-of-informants *Brady*] claim[s] in the first petition and pursue the matter through the [state] habeas process." *McCleskey*, 499 U.S. at 498. Contrary to the district court's view, Prible did not rebut the state court's findings on this point at all, much less by clear and convincing evidence as required by the federal habeas statute. *See* 28 U.S.C. § 2254(e)(1). Prible therefore has not shown cause to excuse the default of these claims. And because he has not shown cause, we need not consider prejudice. *See Murray*, 477 U.S. at 494.

---

[9] *See also Robinson v. State*, 240 S.W.3d 919, 922 (Tex. Crim. App. 2007) (noting "a trial court is free to disregard any *pro se* motions presented by a defendant who is represented by counsel"); *Marshall v. State*, 210 S.W.3d 618, 620 n.1 (Tex. Crim. App. 2006) (declining to address points in appellant's *pro se* brief submitted after counsel filed a brief because "appellant has no right to hybrid representation" (citing *Scheanette v. State*, 144 S.W.3d 503, 505 n.2 (Tex. Crim. App. 2004))); *Rudd v. State*, 616 S.W.2d 623, 625 (Tex. Crim. App. 1981) (finding *pro se* briefs "present[ed] nothing for review" where appellant was "represented by counsel who filed a brief in the case").

No. 20-70010

## C. *Massiah* Claim

We next consider Prible's *Massiah* claim relating to Beckcom (claim six). The district court determined this claim is defaulted[10] but Prible showed cause and prejudice. *Prible*, 2020 WL 2563544, at \*37. We disagree as to cause and so need not reach prejudice.

The state court found that the factual basis for this claim was available to Prible when he filed his first three state habeas applications. The district court held that Prible rebutted this finding based on "Siegler's suppression of information regarding the extent of her relationship with Beckcom and other inmates, and the nature of the arrangement between her and Beckcom." *Ibid.* We disagree.

As already discussed, Prible knew about the alleged ring of informants before he filed his initial state habeas application. Prible eventually asserted the *Massiah* claim himself in his first *pro se* application, alleging Siegler "encouraged Beckcom with the incentive of a letter to the prosecutor asking for a time reduction to get close to Prible and find any information that would aid her in making her case." Like the *Brady* claims, the *Massiah* claim "relied heavily" on information from Walker. *Id.* at \*10; *see id.* at \*37. Despite knowing about the alleged ring of informants, Beckcom's allegedly acting as an agent of Siegler, and Walker's knowledge of pertinent information, Prible and Moore did not diligently investigate and pursue Walker or the *Massiah* issue.

Furthermore, and separate from the *Brady* claims, the factual basis for the *Massiah* claim was available at trial. Beckcom testified to his arrangement with Siegler that she would write a sentence-reduction letter to his

---

[10] The state court dismissed this claim under Texas's abuse-of-the-writ doctrine, which makes it defaulted. *See Coleman*, 456 F.3d at 542; *supra* note 5.

27

No. 20-70010

prosecutor in exchange for his testimony. He also chronologized their inter-
actions: he called Siegler in October 2001; at that time, he "didn't really
[have] too much information" on Prible's case; when they spoke, Siegler ex-
plained that she would only be interested if Beckcom knew "[s]pecifics about
the case, facts;" so, "in that regard" Beckcom "sought to find out as much
as [he] could" from Prible; then, after obtaining the alleged confession,
Beckcom met with Siegler in December 2001 and gave her a letter with the
information he had (Beckcom's letter).

Prible effectively conceded that the trial record alone provided a fac-
tual basis to assert a *Massiah* claim. In his fourth amended federal petition, he
claimed trial counsel and Moore were ineffective for failing to raise a *Massiah*
objection. Prible argued "reasonably competent trial counsel would have re-
alized immediately from the answers to the State's preliminary questions on
direct examination that he should have lodged an objection based on *Mas-
siah*." Prible claimed the December 2001 letter Beckcom gave to Siegler
"shows that Beckcom was a State agent working *quid pro quo* to pry infor-
mation from Prible from the time he first conversed with Prible in late Octo-
ber or early November 2001."

The district court nonetheless found that "Siegler's suppression of
evidence . . . impeded the development of Prible's *Massiah* claim[]." *Id.* at
*37. It reasoned that only after interviewing "Walker and other inmates [did]
Prible's *Massiah* claim bec[o]me anything more than speculative." *Ibid.* We
again disagree.

As with the *Brady* claims, the district court wrongly conflated
knowledge of the factual predicate for the *Massiah* claim with evidence sup-
porting the claim. *See McCleskey*, 499 U.S. at 498. In *McCleskey*, the Supreme
Court held that the factual basis for a *Massiah* claim was available when the
petitioner filed his first petition based on trial testimony that he confessed to

28

a jail-house informant and the informant told the police about their conversations. *Id.* at 498–99. Thus, a previously unavailable document with the informant's statement to police "d[id] not establish that [the petitioner] had cause for failing to raise the *Massiah* claim at the outset." *Id.* at 498.

So too here. Beckcom's trial testimony, together with information Prible later learned about the alleged informant ring, "put [Prible] on notice to pursue the *Massiah* claim in his first [state] habeas petition." *Id.* at 499. Siegler's concealing specifics about her relationship and arrangement with Beckcom cannot establish cause because, given Prible's "knowledge of the information in the [concealed items], any initial concealment would not have prevented him from raising the claim in the first [state] petition." *Id.* at 502.

Accordingly, Prible has not shown cause to excuse the default of his *Massiah* claim. Therefore, "we need not consider whether he would be prejudiced by his inability to raise the alleged *Massiah* violation at this late date." *Ibid.* (citing *Murray*, 477 U.S. at 494).

### D. Semen-DNA *Brady* Claim

Finally, we consider Prible's semen-DNA *Brady* claim (claim ten). The district court found the claim defaulted[11] but concluded Prible showed

---

[11] Prible never raised this claim in state court, so it is unexhausted. *See O'Sullivan*, 526 U.S. at 842–48. The district court accepted without explanation Respondent's argument that the claim is defaulted because the state court would dismiss it as an abuse of the writ if Prible asserted it now. *Prible*, 2020 WL 2563544, at *23 n.19; *see Coleman*, 501 U.S. at 735 n.1; *Finley*, 243 F.3d at 220; *see also* TEX. CODE CRIM. PROC. ANN. art. 11.071 § 5. Prible does not dispute the district court's decision that the claim is defaulted. Because neither party contends otherwise, we accept that the claim is defaulted. *See Norman v. Stephens*, 817 F.3d 226, 231 n.1 (5th Cir. 2016) (noting the State may waive the argument that a claim is merely unexhausted but not procedurally defaulted); *see also Bledsue v. Johnson*, 188 F.3d 250, 254 & n.8 (5th Cir. 1999); *Jackson v. Johnson*, 194 F.3d 641, 652 & n.35 (5th Cir. 1999).

cause and prejudice. *Prible*, 2020 WL 2563544, at *25–27, *34–35. We disagree as to prejudice and so need not reach cause.

Suppressed evidence is material and causes prejudice "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). We consider "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). "If the evidence provides only incremental impeachment value, it does not rise to the level of *Brady* materiality." *Miller v. Dretke*, 431 F.3d 241, 251 (5th Cir. 2005) (citing *Drew v. Collins*, 964 F.2d 411, 419–20 (5th Cir. 1992)).

Prible's semen-DNA *Brady* claim is premised on the State's failure to disclose a note suggesting that McInnis, head of the Harris County crime lab, advised Siegler about the lifespan of sperm cells.[12] The note states: "Pam McInnis – semen lives up to 72 hrs." Prible claims this note "supports his defense that he had consensual sexual contact with [Tirado] earlier in the night" and "impeaches the State's argument that semen deposited in the mouth disappears in 'moments, if not seconds.'" We disagree.

Trial testimony disputed how long semen, and in turn sperm cells, can be *found* in an oral cavity after being deposited, not how long the cells *remain alive* there. For instance, Dr. Carter testified sperm could "stay in the

---

[12] Respondent argues that while the State did not disclose the McInnis note, there was no "suppression" for *Brady* purposes because other sources of evidence regarding the lifespan of sperm cells were available at the time of trial and introduced at trial. Because we conclude Prible has not shown prejudice, we assume suppression and express no view on this argument.

mouth" or "remain present" for "several hours" before normal "bodily processes" eliminated it. These processes, however, "would be immediately curtailed" by "a sudden death, such as from one of these assassin [gun]shots to the neck," leaving detectable sperm present for a longer period. She admitted, however, that she "couldn't say with medical certainty the exact time of the semen." Watson testified that a DNA profile "[a]bsolutely" can be obtained from dead sperm cells, adding that the cells "don't have to be alive . . . for them to be useful in [his] analysis." Like Carter, Watson testified that the usual "active elimination" of sperm from the mouth "end[s] if the victim dies." This led Watson to opine that the DNA profile he obtained "certainly would be consistent" with Prible "depositing the semen in [Tirado]'s mouth moments, if not seconds, before she was killed." Dr. Benjamin contradicted Watson on this point, however. He opined that sperm deposited as a result of sexual assault would usually be eliminated more quickly than sperm deposited from consensual oral sex.

As the record shows, then, the experts disputed how long Prible's sperm could have been present in Tirado's mouth before she was shot, not how long the cells might have remained alive there. We therefore fail to see how a note merely suggesting sperm cells "live[] up to 72 hours" is pertinent to Prible's defense.[13]

Furthermore, testimony of two of the three experts, including one of the State's witnesses (Dr. Carter), actually supported Prible's theory that Tirado consensually performed oral sex on him earlier that night. Moreover, Prible did not claim that Tirado performed oral sex on him "up to 72 hours" before the murders. He only claimed she did so "after [h]e came back from

---

[13] Furthermore, the district court appears to have mistakenly read the note to suggest that sperm cells can live up to seventy-two hours *in an oral cavity*. *See Prible*, 2020 WL 2563544, at *32 & n.23. The note says nothing of the sort.

the club," within a few hours of her death. So the McInnis note's specifying "72 hours" is not even material to confirming Prible's own theory. We thus fail to see how the absence of the that note could have undermined confidence in the verdict.[14] At most, the note was cumulative of other evidence already in the record that supported Prible's theory but that was evidently rejected by the jury. *See United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004) (alteration omitted) (noting "when the undisclosed evidence is merely cumulative of other evidence in the record, no *Brady* violation occurs" (quoting *Spence v. Johnson*, 80 F.3d 989, 995 (5th Cir. 1996))).

Accordingly, Prible has not shown prejudice to excuse the default of his semen-DNA *Brady* claim. We thus need not consider cause. *See Murray*, 477 U.S. at 494.

\* \* \*

Because Prible has failed to show cause and prejudice to overcome his procedural default, we need not decide whether 28 U.S.C. § 2254(e)(2) barred new evidence nor need we reach the merits of Prible's claims.

IV.

We VACATE the judgment granting Prible a writ of habeas corpus and RENDER JUDGMENT denying the writ.

---

[14] *See Reed*, 739 F.3d at 775–76 (finding no prejudice on ineffective assistance claim for failing to challenge DNA evidence where expert's testimony about survival time of sperm cells supported petitioner's argument that he had consensual sex with victim); *Jackson v. Day*, 121 F.3d 705, 1997 WL 450202, at \*2 (5th Cir. 1997) (finding "no reasonable probability that a 'battle of the experts' would have been sufficient to raise a reasonable doubt").