# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 22, 2023

Lyle W. Cayce
Clerk

_____

No. 22-30238

_____

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

ROBERT BRUMFIELD, III; JEREMY ESTEVES

*Defendants—Appellants*.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:17-CR-201-5

_____

Before CLEMENT, ELROD, and WILLETT, *Circuit Judges*.
DON R. WILLETT, *Circuit Judge*:

This appeal arises from a 2013 armed robbery of a Loomis armored truck in New Orleans. One Loomis truck guard, Hector Trochez, was shot and killed during the attack. In total, six people were indicted in connection with the robbery and attendant conspiracy. A jury convicted Robert Brumfield III and his cousin Jeremy Esteves for their roles in the crime.

Before sentencing, new evidence emerged regarding the credibility of two Government witnesses. Esteves and Brumfield moved for a new trial, alleging that the Government had suppressed the evidence in violation of

No. 22-30238

*Brady v. Maryland*[1] and *Giglio v. United States*.[2] The district court denied the motion.

On appeal, Brumfield and Esteves challenge the district court's denial of their motion, contending that the evidence was material impeachment evidence. Brumfield separately challenges the denial on the ground that the Government failed to correct false testimony in violation of *Napue v. Illinois*.[3] He also appeals his sentence.

In short, Brumfield is not entitled to a new trial because the new evidence is not material in light of the entire trial record; his *Napue* claim fails because he has not shown that the Government knowingly presented materially false testimony; and his sentence was procedurally and substantively reasonable. But we conclude that the new evidence was material as to Esteves, so the district court must consider in the first instance whether he has satisfied all the elements of his *Brady* claim.

We AFFIRM IN PART, REVERSE IN PART, and REMAND to the district court for further consideration of Esteves's *Brady* claim.

I

In December 2013, a Chevy Tahoe with heavily tinted windows pulled up in front of a Chase Bank as an armored Loomis truck was making a delivery. Three armed men stepped out. Loomis guard Anjene Treaudo sat in the truck's driver's seat while a second guard, Hector Trochez, unloaded the currency. The three men shot at the truck and Trochez, killing him. The men then stole around $260,000 from the truck and sped off in the Tahoe. A

---

[1] 373 U.S. 83, 87 (1963).

[2] 405 U.S. 150, 154 (1972).

[3] 360 U.S. 264, 269 (1959).

brave eyewitness followed them. He saw two men exit the Tahoe and get into a second getaway car—a green Honda. The Tahoe, which was stolen a week before the robbery, was found abandoned nearby, its engine still running.

After a years-long investigation, police traced the robbery to Lilbear George, Curtis Johnson, Jr., Chukwudi Ofomata, Esteves, and Brumfield. All five were charged with conspiracy and other charges related to the robbery and Trochez's murder. Brumfield and Esteves were charged with three counts: (1) conspiracy to obstruct commerce by robbery, in violation of 18 U.S.C. § 1951(a); (2) obstruction of commerce by robbery, in violation of 18 U.S.C. § 1951(a); and (3) using, carrying, brandishing, and discharging firearms during and in relation to a crime of violence, causing death, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) and (j)(1).

Brumfield and Esteves moved to sever their cases from the other defendants who faced the death penalty. The district court granted the motions, and Brumfield and Esteves continued to trial.

Two days into trial, Brumfield and Esteves learned that the Government had failed to disclose two pieces of evidence: (1) phone recordings about the Loomis robbery between an FBI informant and cooperating witness Jamell Hurst; and (2) the FBI's informant file on Hurst, which contained an agreement between Assistant United States Attorney (AUSA) McMahon and the Orleans Parish District Attorney's Office not to extradite Hurst in connection with a 2013 aggravated burglary warrant.

Because Hurst's testimony is central to Brumfield's and Esteves's *Brady* claim, we briefly recount his testimony. Hurst was one of the Government's main witnesses. He had been an FBI informant since at least 2014. At trial, Hurst implicated both Brumfield and Esteves in the robbery and conspiracy. As to Brumfield's involvement, Hurst testified that Brumfield told him he was staking out an armored truck in preparation for a

robbery and that Brumfield commented that the robbery would be easy because the man in the truck was "big, fat, and clumsy." Hurst also said that he spoke with George, who told him Brumfield "was supposed to be involved in the robbery, but that he didn't have the character to pull it off and so he was replaced." Esteves, too, told Hurst that Brumfield was supposed to participate in the robbery, but the other participants were concerned he would "freeze up."

As to Esteves's involvement, Hurst testified that Esteves confessed that he, George, Ofomata, and Johnson committed the robbery and that Esteves was a getaway driver. Hurst told an FBI agent that in May 2014, Esteves drove him to Esteves's mother's home and showed him money in a shoebox. The FBI later found approximately $20,000, some of which was in a shoebox in the home.

As to the benefits Hurst received for testifying, Hurst testified that the government told him it would inform the Baton Rouge district attorney or judge overseeing his pending sexual battery charges that he was cooperating with the Loomis investigation. He also testified that the FBI gave him $1,200 to help buy a new phone and move back to New Orleans and that he was interested in the $50,000 reward for the information he provided.

Brumfield and Esteves moved for a mistrial based on the newly disclosed evidence. The district court continued trial to allow the defendants to review the evidence. It heard argument and orally denied the motions, holding that Brumfield and Esteves were not prejudiced by the Government's failure to disclose the evidence because they had a continuance to review the evidence before cross-examining Hurst.

The jury convicted Esteves on all three counts. But it convicted Brumfield only of conspiracy to commit the robbery.

After the verdict but before sentencing, Ofomata's counsel disclosed to Brumfield's and Esteves's counsel additional evidence about benefits that Hurst and another Government witness, Lydell Hinton, obtained for cooperating with the Government. Brumfield and Esteves moved for a new trial, arguing that the Government violated *Brady* and *Giglio*. The district court denied the motion, holding that the new evidence was immaterial in light of the entire trial record.

The same district judge sentenced all five defendants. Brumfield filed ten objections to his presentence investigation report (PSR). The Government opposed all of them. Most relevant here, Brumfield objected to (1) the district court's finding that he was the second getaway driver; (2) its rejection of the downward adjustment for being a minor participant; and (3) its application of the murder cross-reference for Trochez's death. The district court ruled on each objection in a written order, overruling the three objections relevant to this appeal.[4] The court sentenced Brumfield to 240 months' imprisonment—the statutory maximum. Esteves received 600 months' imprisonment—120 months for Counts 1 and 2, and 600 months for Count 3, to be served concurrently. He does not appeal his sentence.

Brumfield and Esteves timely appealed the district court's denial of their motions for a new trial. Brumfield also challenges his sentence.

## II

Brumfield and Esteves both challenge the district court's denial of their motion for a new trial. Brumfield raises two additional arguments. First, he argues that the Government violated his due process rights by failing to correct allegedly false witness testimony in violation of *Napue v. Illinois*.

---

[4] The district court sustained three of Brumfield's objections relating to certain factual information in the PSR and overruled the other seven objections.

Second, he argues that his sentence is procedurally and substantively unreasonable. We address the motions for a new trial first.

A

We first address whether the Government suppressed material impeachment evidence in violation of *Brady*, entitling Brumfield and Esteves to a new trial. "We review motions for a new trial based on an alleged *Brady* violation *de novo*, 'while acknowledging that we must proceed with deference to the factual findings underlying the district court's decision.'"[5]

The district court denied the motions for a new trial because the evidence was immaterial in light of the entire trial record. We agree as to Brumfield, but not as to Esteves.[6]

"To prevail on a *Brady* claim, 'a defendant must show: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the prosecution; and (3) the evidence was material.'"[7] For evidence to be material, there must be "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been

---

[5] *United States v. Perry*, 35 F.4th 293, 345 (5th Cir. 2022) (quoting *United States v. Sipe*, 388 F.3d 471, 479 (5th Cir. 2004)); *see also United States v. Severns*, 559 F.3d 274, 278 (5th Cir. 2009).

[6] The district court doubted that Brumfield and Esteves could establish that the Government suppressed evidence of benefits or promises made to Hurst. Assuming that they could produce sufficient evidence of suppression, the district court concluded that such evidence would be favorable. But the court held that because the evidence was immaterial, their claim would fail even if the first two elements of their *Brady* claim had been met.

[7] *United States v. Swenson*, 894 F.3d 677, 683 (5th Cir. 2018) (quoting *United States v. Dvorin*, 817 F.3d 438, 450 (5th Cir. 2016)); *see also Giglio*, 405 U.S. at 154–55 (applying *Brady* to impeachment evidence).

No. 22-30238

different."[8] "A 'reasonable probability' is established when the failure to disclose the suppressed evidence 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'"[9]

Brumfield and Esteves contend that the Government suppressed the following evidence of Hurst's benefits for cooperating[10]:

- Recordings of seven phone calls from Hurst to his mom while he was in jail, in which he asked his mom to call the FBI. Hurst said that FBI Special Agent Rayes told him that he could get his charges dismissed and that Rayes and AUSA McMahon told him they could get him out of anything but murder. Hurst's mom reported to Hurst that Special Agent Elmer was working with the district attorney to get him out.

- A New Orleans Police Department (NOPD) incident report regarding Hurst's 2013 aggravated burglary charge that states that the victim was "one hundred percent sure" that Hurst was the perpetrator. Hurst testified that the charges were dismissed because the witness mistakenly picked him in the photo lineup.

- A Brazoria County, Texas, investigation report showing that Hurst (1) was arrested for possessing 37 stolen credit cards and controlled substances and (2) was later indicted for fraudulently possessing only two credit cards. At trial, Hurst testified only to the latter.

- A Baton Rouge Police Department incident report regarding Hurst's 2014 arrest for battery, which stated that an officer discovered that Hurst had an outstanding warrant

---

[8] *United States v. Bagley*, 473 U.S. 667, 682 (1985).

[9] *United States v. Runyan*, 290 F.3d 223, 247 (5th Cir. 2002) (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).

[10] The defendants do not challenge the evidence concerning Hinton's benefits.

No. 22-30238

for burglary issued by the NOPD. The report states that the officer was initially advised that the NOPD wanted Hurst booked, but that the officer was then advised by the NOPD to release Hurst because he was an informant.

- A Louisiana Department of Public Safety and Corrections file on Hurst, which states that Hurst had an active warrant issued by Texas and that "Texas indicated that they were coming to get [Hurst]." Another entry states that Special Agent Elmer called on the same date that the Texas arrest warrant was issued and asked to speak with Hurst's supervising probation officer. Another earlier entry notes that Special Agent Elmer called in October 2014 seeking Hurst's contact information and stating that he was trying to retrieve "some type of FBI issued equipment."[11]

Brumfield and Esteves argue that Hurst was the only witness who implicated them in the crimes, so the above impeachment evidence was critical to attacking his credibility.

We have explained that "when the undisclosed evidence is merely cumulative of other evidence in the record," such as "when it merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable," it is not material.[12] Nor is suppressed evidence material "when the testimony of the witness who might have been impeached by the undisclosed evidence is strongly corroborated by additional evidence supporting a guilty verdict."[13] Thus, we must consider whether the new evidence was cumulative of the evidence heard at trial and

---

[11] Brumfield and Esteves also argued below that the Government suppressed evidence concerning Hurst's mental health, but they do not press that issue on appeal.

[12] *Sipe*, 388 F.3d at 478, 489 (cleaned up).

[13] *Id.* at 478.

whether Hurst's testimony was strongly corroborated by additional evidence supporting the verdicts.

Hurst was thoroughly impeached at trial, but this doesn't end our inquiry because we agree with the district court that "[t]here is a significant difference in degree and kind between the benefits Hurst testified about at trial" and the benefits revealed by the undisclosed evidence. Hurst admitted that he had initially lied to the FBI about several details about the robbery. The jury heard about his criminal history, including his arrest for credit card fraud and his cooperation with the Secret Service on that charge, and that at one point, he had an open warrant for aggravated burglary. The jury also heard that Hurst was currently in jail for simple burglary, criminal damage, home invasion, aggravated assault, sexual battery of a six-year-old, and indecent behavior with a juvenile.

As to the benefits Hurst received from cooperating with the Government, defense counsel cross-examined Hurst on the evidence that led to the motion for a mistrial, which revealed that Hurst was an FBI informant and that the NOPD decided not to extradite Hurst on his outstanding aggravated battery warrant.[14] The jury also heard that Hurst was motivated to testify because (1) he hoped the prosecution would talk to the district attorney or judge in Baton Rouge about his cooperation, and (2) he was interested in receiving the $50,000 reward.

---

[14] Special Agent Elmer testified that he did not recall whether or not Hurst had an open warrant. But when presented with the FBI form, Elmer testified that he must have been aware of it, and if the FBI was able to clear Hurst, he speculated that they may have worked with the district attorney. But defense counsel did not press Special Agent Elmer on the extradition agreement and whether Special Agent Elmer did in fact intercede on Hurst's behalf.

No. 22-30238

Hurst testified that the Government did not intervene on his behalf regarding his aggravated burglary warrant, but the jury did not hear about the evidence suggesting (1) that Hurst received additional promises from the Government or (2) that the Government may have fulfilled those promises. As to the additional promises, the phone call recordings indicate that an FBI agent promised to get Hurst out of any charge except murder. The recordings and the reports also suggest that the Government *may* have made good on that promise. But whether Hurst actually received help from the Government is unclear. The district court noted that the evidence did not "conclusively establish that the government assisted Hurst in the past, or promised to assist him in the future," and the Government denied intervening in Hurst's other charges. Even so, the Government's *promise* for leniency in exchange for Hurst's testimony would be "more powerful" impeachment evidence than the mere *possibility* of a favorable outcome.[15] We therefore conclude that the new evidence was not cumulative of the other impeachment evidence.

We next turn to whether Hurst's testimony was "strongly corroborated" by other evidence that supports the guilty verdicts.[16] We must decide whether there is a reasonable probability that, if the allegedly suppressed evidence had been disclosed, the result would have been different. Our inquiry "is not a sufficiency of the evidence test," however.[17]

_____

[15] *See Dvorin*, 817 F.3d at 451.

[16] *See Sipe*, 388 F.3d at 478; *see also Rocha v. Thaler*, 619 F.3d 387, 396 (5th Cir. 2010) ("The materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state.").

[17] *LaCaze v. Warden*, 645 F.3d 728, 737 (5th Cir. 2011); *Sipe,* 388 F.3d at 489 ("[T]he materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is

Instead, we must ask whether the evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."[18] Generally, we have found that undisclosed impeachment evidence is material where the evidence of the defendant's guilt was "overwhelming."[19] Although there is overwhelming evidence against Brumfield, who was convicted only of conspiracy, we cannot say the same for Esteves, who was convicted on all three charges.

Start with the evidence against Brumfield. Hurst testified that Brumfield told him that the group was staking out the armored truck and that the robbery would be easy because the guard "was big, fat, and clumsy." This evidence was strongly corroborated by other evidence at trial.[20] Hinton placed Brumfield squarely within the conspiracy. Hinton owned a rap studio where Brumfield and the other conspirators frequented to "get off the street, if the police was hot, [to] go in there and take a chill pill." Hinton testified that, after the robbery, Brumfield showed up late to a recording session after being questioned by the FBI about the robbery. Brumfield told Hinton that he wanted to rap about the FBI questioning him about his involvement. Although Hinton counseled against it, he heard that Brumfield later rapped about it anyway, but Hinton said he never heard the recording. Hinton also

---

sufficient to support the jury's conclusions." (alteration in original) (quoting *Strickler v. Greene*, 527 U.S. 263, 290 (1999))).

[18] *LaCaze*, 645 F.3d at 736.

[19] *See, e.g.*, *Perry*, 35 F.4th at 347; *United States v. Davis*, 609 F.3d 663, 696 (5th Cir. 2010); *United States v. O'Keefe*, 128 F.3d 885, 897 (5th Cir. 1997).

[20] *See LaCaze*, 645 F.3d at 736 ("A *Brady* violation is more likely to occur when the impeaching evidence would seriously undermine the testimony of a key witness on an essential issue *or there is no strong corroboration*." (emphasis added) (internal quotation marks and citation omitted)).

testified that Brumfield admitted that he was "waiting" in "a green Honda" to be the getaway driver after the robbery.

Cedric Wade, who grew up with Esteves and was close friends with Ofomata and Brumfield, was a critical witness. He testified that Brumfield was a well-known, close associate of the other co-conspirators, known as "the circle." Ofomata's ex-girlfriend testified that Brumfield and Ofomata were so close they had "a little brother/big brother type of relationship." Phone records linked Brumfield to a Chase Bank employee, Thierry King,[21] and showed that Brumfield and Esteves talked the morning of the robbery. Shortly after the robbery, the phone associated with Brumfield used a cell phone tower that was near both the Chase Bank and Adams Street, where the Tahoe was located after the robbery.

Brumfield primarily relies on two cases in support of his argument that the new evidence is material. The first is *Smith v. Cain*.[22] There, the prosecution failed to turn over a detective's notes that stated that the only eyewitness expressed doubt about whether he saw the perpetrator's face.[23] At trial, the witness had testified that he had "no doubt" about the defendant's identity.[24] The Supreme Court held that the evidence was material because the detective's notes directly contradicted the witness's testimony, which "was the *only* evidence linking [the defendant] to the crime."[25] Here, the new evidence is not as critical. To be sure, the new evidence shows that the benefits Hurst received were greater than what he

---

[21] King was a person of interest in the robbery, but she was not arrested or charged.

[22] 565 U.S. 73 (2012).

[23] *Id.* at 74, 76.

[24] *Id.* at 76 (cleaned up).

[25] *Id.*

testified to. But as we explained above, he was impeached on other grounds, his testimony wasn't the only evidence connecting Brumfield to the conspiracy, and his testimony was corroborated.

The second is *Wearry v. Cain*.[26] There, the prosecution withheld evidence of two witnesses' motives to testify. The prosecution failed to disclose that (1) the first witness had a personal vendetta against the defendant and wanted to ensure the defendant "gets the needle cause he jacked [him] over,"[27] and (2) the second witness approached the prosecution twice, offering to testify in exchange for a deal.[28] This contradicted the second witness's testimony at trial that his only motive for testifying was out of love for his sister, who was friends with the victim's sister, a narrative the prosecution emphasized.[29] The Supreme Court held that both pieces of evidence were material. Here, the contrast between Hurst's testimony and his motives as revealed by the new evidence is less stark. At trial, Hurst admitted that he asked the Government for help. As explained above, the new evidence just shows that there may have been additional benefits.[30] And the evidence did not reveal that Hurst had an undisclosed vendetta against Brumfield.

Next consider the evidence against Esteves. Hurst also testified that Esteves told him that the group staked out the robbery, but most importantly,

---

[26] 577 U.S. 385 (2016).

[27] *Id.* at 389.

[28] *Id.* at 390.

[29] *Id.* at 394.

[30] *Cf. LaCaze*, 645 F.3d at 738 (holding that the prosecutor's undisclosed promise to a witness that the witness's son would not be prosecuted put the whole case in a "different light" where the witness said he likely would not have testified but for the promise and that witness was the only witness testifying to a critical element of the crime).

unlike his testimony about Brumfield, Hurst testified to Esteves's specific role in the robbery. He said that Esteves told him that he drove the Tahoe and "never got out of the car." Hurst also testified that George, too, told him that Esteves was the driver. Finally, Hurst testified that Esteves took him to Esteves's mother's house and showed him a stack of money in a shoebox but that Esteves didn't say where the money came from.

While some of Hurst's testimony was corroborated, we cannot say that it was *strongly* corroborated. Wade testified that Esteves was also part of "the circle." Wade said that on the morning of the robbery, Ofomata, Johnson, George, and Esteves arrived at his house to pick up firearms that Ofomata had dropped off the night before. According to Wade, Ofomata grabbed the bag, checked its contents, and on the way out, told Wade, "Watch the news. We going to be straight." Wade testified that this meant that "something is about to happen to where he's about to get some money." Wade then followed Ofomata out of the house and watched him put the duffle bag into the back of a dark gray Tahoe and get in. Wade testified that he could see the Tahoe's other passengers: Esteves was in the driver's seat, George was in the passenger seat, and Johnson was in the backseat behind George. But he allegedly saw Esteves through the Tahoe's windows that were so "heavily tinted" that "the normal person" would not have been able see through them. Historical cell site data showed that George's phone made calls using cell towers near Wade's residence and then near the Chase Bank on the day of the robbery, but the records don't reveal whether Esteves was near the robbery like Brumfield was.

Eyewitness accounts and the Chase Bank's surveillance footage generally corroborates Wade's testimony about the Tahoe's passengers, but there is no specific testimony about the Tahoe's driver. Treaudo, the other Loomis guard, witnessed the robbery from inside the Loomis truck and testified that three men exited the vehicle. She said two men exited from the

passenger side of the vehicle, but she did not remember whether the third came from the driver's seat. The other eyewitness, who watched the robbery from his car, testified that he saw two men standing on the side of the Tahoe, leaning over the door, and shooting at someone. He also saw a third man running to get into the back seat immediately before the robbers made their getaway.

Wade testified that later that day, Ofomata returned to Wade's residence and put money inside an air conditioning unit. Wade also testified that Esteves told him that he was concerned that Brumfield was snitching to the FBI about the robbery. King also had Esteves's number in her phone; Esteves's number was in her top ten most contacted numbers. And finally, a search warrant of Esteves's mother's house revealed $20,000, some of it in shoeboxes. Although the information about the money came from Hurst, Special Agent Elmer testified to a jail call he listened to between Esteves and his girlfriend at the time, in which Esteves told her that he had money in shoeboxes in his closet. But Loomis does not tally money by serial number, so the only way for the Government to connect the money to the robbery is by the bills' denomination. And there was evidence suggesting that the money may have been from Esteves's employer, who paid him exclusively in cash. Much of this evidence implicates Ofomata and the other robbers, rather than Esteves.[31]

---

[31] *See Wearry*, 577 U.S. at 393 (dismissing evidence in a *Brady* analysis that only "suggest[ed], at most, that someone in [the defendant's] group of friends may have committed the crime").

No. 22-30238

Although a close question, we conclude that Esteves has shown that "the new evidence is sufficient to 'undermine confidence in the verdict'" and is thus material.[32]

In sum, we conclude that based on the evidence presented at trial, the evidence was immaterial as to Brumfield, but not as to Esteves. Esteves, however, has not satisfied all elements of his *Brady* claim to warrant a new trial. The district court did not consider whether Government suppressed the new evidence, so we remand to the district court to consider this prong in the first instance.

B

We next consider Brumfield's *Napue* claim. Although we ordinarily review an order denying a new trial under *Napue* for abuse of discretion,[33] Brumfield raises this issue for the first time on appeal. Brumfield argues that he preserved his *Napue* claim because, in his motion for a new trial, he asserted that Hurst falsely testified that he didn't expect any benefit for testifying and that AUSA McMahon knew that wasn't true. But Brumfield discussed the allegedly false statements only in the context of his *Brady* claim. Thus, we review this issue for plain error.[34]

To establish a *Napue* violation, Brumfield must prove: "(1) [the witness] testified falsely; (2) the government knew the testimony was false;

---

[32] *Id.* at 392 (quoting *Smith*, 565 U.S. at 75).

[33] *United States v. Stanford*, 823 F.3d 814, 838 (5th Cir. 2016) (citing *United States v. Wall*, 389 F.3d 457, 465 (5th Cir. 2004)).

[34] *United States v. Oti*, 872 F.3d 678, 690, 696 n.13 (5th Cir. 2017). "[E]ven if we were to determine that [Brumfield] preserved his challenge under *Napue* and were to review his argument under an abuse of discretion standard of review, we would conclude that he does not prevail under that standard." *Id.* at 696 n.13.

and (3) the testimony was material."[35] "Even assuming that the prosecution presented (or failed to correct) false testimony, the critical factor is materiality."[36] "The Supreme Court has 'defined materiality in terms of a "reasonable probability" of a different outcome,' which 'results when nondisclosure places the case in a different light so as to undermine confidence in the verdict.'"[37]

Brumfield asserts that the prosecution failed to correct allegedly false testimony three times. As with Brumfield's *Brady* claim, the evidence concerns Hurst's benefits from testifying—namely, his 2013 warrant for aggravated burglary.

First, Brumfield argues that Special Agent Elmer falsely testified on cross-examination that Hurst "[d]id not have an outstanding warrant" for aggravated burglary when the FBI form registering Hurst as an informant indicated he did in fact have an outstanding warrant. Second, Brumfield argues that Hurst falsely testified that his burglary warrant was not pursued because the victim mistook him as the perpetrator when the NOPD incident report stated that the victim identified Hurst with "one hundred percent" certainty. And finally, Brumfield says that Special Agent Elmer and Hurst falsely testified that the FBI did not intervene on Hurst's behalf after the burglary warrant was issued when the new evidence revealed that the New

---

[35] *United States v. Mason*, 293 F.3d 826, 828 (5th Cir. 2002). Brumfield argues that the Government violates *Napue* if it knew or should have known that a witness's testimony was false. In support of this standard, Brumfield cites to one unpublished opinion, in which this court noted that it has granted a new trial when the government suppressed evidence it should have known was false. *See United States v. Jena*, 590 F. App'x 324, 327 (5th Cir. 2014). But we need not address this argument because he has not proven that the testimony presented was materially false.

[36] *Stanford*, 823 F.3d at 839.

[37] *Id.* (citation omitted) (quoting *O'Keefe*, 128 F.3d at 894).

Orleans district attorney's office asked that Hurst not be booked because he was an informant.

As we explained in the *Brady* analysis, the new evidence regarding Hurst's warrant—and the testimony here—is immaterial in light of the entire record. The jury heard testimony about Hurst's warrant, including the new evidence that precipitated the motion for a mistrial, and knew that New Orleans chose not to book Hurst on the warrant. What's more, even assuming Elmer's testimony was false, and not a result of mistake or faulty memory,[38] defense counsel elicited the testimony during cross-examination. We have held that "when the defense elicits the alleged perjury on cross-examination, no material falsehood has occurred because the government has not itself knowingly presented false testimony."[39]

Thus, Brumfield has failed to demonstrate a *Napue* violation.

## C

Finally, we consider Brumfield's challenge to the legality of his sentence. In reviewing Brumfield's sentence, we are "limited to determining whether [it is] 'reasonable.'"[40] Our review is bifurcated.[41] "First, [we] must

---

[38] Special Agent Elmer testified that he thought the form was incorrect, could not recall anything about the warrant, and believed there was no warrant. *Cf. Stanford*, 823 F.3d at 841 ("In sum, although the falsehoods that Stanford alleges are based on apparent evidentiary inconsistencies, it is questionable whether one could describe the inconsistencies as false, let alone material.").

[39] *O'Keefe*, 128 F.3d at 894; *see also United States v. Fields*, 761 F.3d 443, 477 (5th Cir. 2014) ("Here, the falsehood also occurred during cross-examination. As a result, the testimony is not material.").

[40] *United States v. Rhine*, 637 F.3d 525, 527 (5th Cir. 2011) (quoting *Gall v. United States*, 552 U.S. 38, 46 (2007)).

[41] *United States v. Rodriguez*, 523 F.3d 519, 524–25 (5th Cir. 2008) (citing *Gall*, 552 U.S. at 51).

ensure that the district court committed no significant procedural error."[42] If there is no procedural error, we review the sentence's substantive reasonableness for abuse of discretion.[43]

1

First, procedural reasonableness. Procedural reasonableness "requires that the district court calculate the Guidelines range, consider the [18 U.S.C.] § 3553(a) factors, and explain the sentencing decision."[44] When, as here, the sentencing objections are preserved, we review "the district court's interpretation or application of the sentencing guidelines *de novo*, and its factual findings for clear error."[45] "A finding of fact is not clearly erroneous '[a]s long as it is plausible in light of the record read as a whole.'"[46]

Brumfield argues that the district court made four procedural errors in calculating his sentence: (1) finding that he was the second getaway driver without supporting evidence; (2) applying the murder cross-reference for Trochez's death, even though his death was not reasonably foreseeable; (3) failing to apply the minor-participant downward variance when Brumfield was only peripheral to the crime; and (4) using acquitted conduct to enhance his sentence. We address each in turn.

---

[42] *Id.* at 525.

[43] *Id.*

[44] *Rhine*, 637 F.3d at 528 (quoting *Gall*, 552 U.S. at 51); *United States v. Douglas*, 957 F.3d 602, 606 (5th Cir. 2020) ("[A] district court commits 'significant procedural error' when it 'fail[s] to calculate (or improperly calculate[es]) the Guidelines range.'" (second and third alterations in original) (quoting *Gall*, 552 U.S. at 51)).

[45] *United States v. Halverson*, 897 F.3d 645, 651 (5th Cir. 2018) (citation omitted).

[46] *United States v. Betancourt*, 422 F.3d 240, 245 (5th Cir. 2005) (alteration in original) (quoting *United States v. Morris*, 46 F.3d 410, 419 (5th Cir. 1995)).

a

Brumfield offers two reasons why the district court erred in finding he was the second getaway driver. First, he argues that the district court ignored his factual arguments in violation of Federal Rule of Criminal Procedure 32(i)(3)(B). And second, he argues that this finding was not supported by a preponderance of the evidence.

Under Rule 32, the district court "must—for any disputed portion of the presentence report . . .—rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing."[47] We have "rejected the proposition that a court must make a catechismic regurgitation of each fact determined."[48] Rather, we have explained that "the district court [may] make implicit findings by adopting the PSR."[49] Rule 32 is satisfied if "the findings in the PSR are so clear that the reviewing court is not left to 'second-guess' the basis for the sentencing decision."[50]

Here, the district court issued a detailed written order explaining the reasons for overruling each of the challenged objections. It explained the specific evidence that supported the finding that Brumfield was the getaway driver, including testimony from Hinton and Hurst, factual basis statements from George and Ofomata, and the fact that the PSR was corroborated by witness testimony, cell phone records, and statements by Brumfield's coconspirators.

---

[47] Fed. R. Crim. P. 32(i)(3)(B).

[48] *United States v. Ramirez-Gonzalez*, 840 F.3d 240, 246 (5th Cir. 2016) (internal quotation marks and citation omitted).

[49] *Id.*

[50] *Id.* (quoting *United States v. Carreon*, 11 F.3d 1225, 1231 (5th Cir. 1994)).

Brumfield also argues that the district court's finding is unsupported by a preponderance of the evidence because (1) the eyewitness testified that one of the robbers got into the driver's seat of the Honda, and (2) the evidence showed that Brumfield and Esteves were calling each other, which means they could not have been in the Honda together. Neither proves that the district court's finding is clearly erroneous.

"[T]he district court need only determine its factual findings at sentencing by a preponderance of the relevant and sufficiently reliable evidence."[51] As to the eyewitness's testimony, Brumfield misstates the record. On cross-examination, the eyewitness testified that one of the co-conspirators got in the car on the "driver's side." When asked whether the individual was getting into the driver's *seat*, the witness responded, "One of those doors, yes, sir, on the street side of the car." But he said that he did not look long enough to see if anyone was sitting inside the vehicle waiting. Consequently, the district court's conclusion that Brumfield was the driver is not inconsistent with eyewitness testimony.

Brumfield's second argument fares no better. The eyewitness testified that only two robbers got into the second getaway car, although he could not identify them. The cell phone records showed that a phone associated with Brumfield used a cell phone tower near the Chase Bank and Adams Street, where the second getaway car was waiting. So the district court's finding that Brumfield was driving the Honda was "plausible in light of the record read as a whole."[52]

_____

[51] *Betancourt*, 422 F.3d at 247 (citation omitted).

[52] *See id.* at 245.

Accordingly, the district court did not clearly err in finding that Brumfield was the second getaway driver.

b

Brumfield next argues that the district court erred in applying the murder cross-reference under § 2B3.1 of the Guidelines because Trochez's murder was not foreseeable from his involvement. Brumfield argues that his conduct was outside the scope of what led to Trochez's murder because (1) at most Brumfield took part in the surveillance of the truck the week before the robbery, and (2) he withdrew from the conspiracy when he was "kicked out."

Under § 2B3.1, the murder cross-reference applies "[i]f a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111."[53] "Co-conspirator liability under § 1B1.3 does not automatically arise because of participation in a conspiracy."[54] Rather, "[f]or sentencing purposes, a defendant can be liable for conduct that is (1) 'within the scope of the jointly undertaken criminal activity,' (2) 'in furtherance of that criminal activity,' and (3) 'reasonably foreseeable in connection with that criminal activity.'"[55] "'Jointly undertaken criminal activity' is defined as 'a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy.'"[56] Whether

---

[53] U.S.S.G. § 2B3.1.

[54] *United States v. Morrow*, 177 F.3d 272, 302 (5th Cir. 1999).

[55] *United States v. Gonzales*, 841 F.3d 339, 359 (5th Cir. 2016) (quoting U.S.S.G. § 1B1.3(a)(1)(B)).

[56] *Morrow*, 177 F.3d at 302.

No. 22-30238

an action was "reasonably foreseeable" or "in furtherance" of a "jointly undertaken criminal activity" is a fact question.[57]

The district court did not err in applying the murder cross-reference. Brumfield agreed to jointly undertake the armed robbery of the Loomis truck. The nature of a bank robbery demands the reasonable foreseeability that a weapon would be used during the crime.[58] Indeed, bank robbery "is, by its nature, a violent crime."[59]

The district court also grounded application of the murder cross-reference in an example in the Guidelines that mirrors Brumfield's participation:

> Defendant C is the getaway driver in an armed bank robbery in which $15,000 is taken and a teller is assaulted and injured. Defendant C is accountable for the money taken under subsection (a)(1)(A) because he aided and abetted the act of taking the money (the taking of money was the specific objective of the offense he joined). Defendant C is accountable for the injury to the teller under subsection (a)(1)(B) because the assault on the teller was within the scope and in furtherance of the jointly undertaken criminal activity (the robbery), and was reasonably foreseeable in connection with that criminal activity (given the nature of the offense).[60]

Replace "armed bank robbery" for "armored truck robbery" and "assaulted" for "killed" and you have this case.

---

[57] *Id.*

[58] *United States v. Burton*, 126 F.3d 666, 679 (5th Cir. 1997).

[59] *United States v. Jordan*, 945 F.3d 245, 264 (5th Cir. 2019).

[60] U.S.S.G. § 1B1.3 cmt. 4(B)(i).

23

That Brumfield was "kicked out" of the conspiracy is irrelevant. What matters is that he did not withdraw. To constitute a withdrawal, Brumfield must have committed an "affirmative act to defeat, disavow or discourage the conspiracy."[61] He "must show that he has committed affirmative acts inconsistent with the object of the conspiracy that [were] communicated in a manner reasonably calculated to reach conspirators."[62] He has not done so.

Thus, the district court did not err in applying the cross-reference.

c

Brumfield next argues that the district court erred in declining to apply a two-level minor-participant reduction under § 3B1.2(b). He contends that he was a minor participant because he was kicked out of the conspiracy, didn't receive any robbery proceeds, and wasn't heavily involved in the planning stages. "Whether [Brumfield] was a minor or minimal participant is a factual determination" we review for clear error.[63]

Section 3B1.2(b) of the Guidelines allows the court to apply a two-level sentence reduction if the defendant "was a minor participant in any criminal activity."[64] "[A] 'minor participant' is someone who is less culpable than most participants but more culpable than a minimal participant."[65] "A 'minimal participant' is someone who lacks knowledge or understanding

---

[61] *United States v. Romans*, 823 F.3d 299, 320 (5th Cir. 2016).

[62] *United States v. Mann*, 161 F.3d 840, 860 (5th Cir. 1998).

[63] *United States v. Gomez-Valle*, 828 F.3d 324, 327 (5th Cir. 2016) f(citation omitted); *see also Jordan*, 945 F.3d at 264 ("[W]e also review the district court's decision not to apply a sentencing reduction de novo on the law, but for clear error on the facts.").

[64] U.S.S.G. § 3B1.2(b).

[65] *United States v. Broussard*, 882 F.3d 104, 111 (5th Cir. 2018).

about the scope or structure of the enterprise."[66] This determination "is based on the totality of the circumstances" and "is heavily dependent upon the facts of the particular case."[67]

In determining whether a defendant's participation was "minor," the Guidelines instruct courts to consider: (1) the defendant's understanding of the "scope and structure of the criminal activity"; (2) the defendant's "participat[ion] in planning or organizing the criminal activity"; (3) the defendant's "decision-making authority or influence[]"; (4) "the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts"; and (5) "the degree to which the defendant stood to benefit from the criminal activity."[68]

The district court made findings on all but the third factor. Based on the totality of the circumstances, the court could have reasonably concluded that Brumfield understood the scope of the criminal activity. He understood that the "armored car guards would not relinquish proceeds of the robbery to his co-defendants in response to a 'please' and a 'thank you,'" and that he was being replaced due to concerns he would "freeze up" in the face of the likely violence. The evidence also supports a finding that Brumfield took part in planning and organizing the robbery; that Brumfield's participation as the second getaway driver facilitated the robbery by helping his co-conspirators avoid apprehension; and that he stood to benefit financially from the robbery.

---

[66] *Id.*

[67] U.S.S.G. § 3B1.2 cmt. 3(C).

[68] *Id.*

No. 22-30238

That Brumfield did not have decision-making authority does not change this analysis.[69]

The district court did not clearly err in determining that Brumfield was not a minor participant. A reduction based on Brumfield's role in the robbery was unwarranted.

d

Finally, Brumfield argues that the district court erred in relying on acquitted conduct. But he concedes that this argument is foreclosed under *United States v. Watts*.[70] That concession is correct.[71] Accordingly, the district court did not err in relying on acquitted conduct.

2

We now turn to substantive reasonableness. Substantive reasonableness "depends on 'the totality of the circumstances, including the extent of any variance from the Guidelines range.'"[72] The district court sentenced Brumfield to a sentence within the Guidelines, so his sentence is

---

[69] *See Jordan*, 945 F.3d at 265 ("As [the defendant] notes, the Government did not provide evidence that [he] had decision-making authority. But, even without such evidence, the other three factors support the district court's finding that [he] was not a minimal or minor participant.").

[70] 519 U.S. 148 (1997).

[71] *Id.* at 157 (holding that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence"); *see also United States v. Gaspar-Felipe*, 4 F.4th 330, 343 n.11 (5th Cir. 2021) ("[The defendant's] argument that the Constitution bars considering acquitted conduct during sentencing is foreclosed by Supreme Court precedent. And we have repeatedly rejected his follow-up argument that *Watts* is no longer good law." (citation omitted)).

[72] *Rhine*, 637 F.3d at 528 (quoting *Gall*, 552 U.S. at 51).

presumptively reasonable.[73] Brumfield can rebut the presumption only by "demonstrat[ing] that the sentence does not account for a factor that should receive significant weight, gives significant weight to an irrelevant or improper factor, or represents a clear error of judgment in balancing sentencing factors."[74]

Brumfield argues that the district court erred in sentencing him to the statutory maximum because the court did not consider Brumfield's "peripheral" role in the conspiracy, gave too much weight to Brumfield's comment before the robbery that Trochez was "a big, fat, clumsy guy," and improperly weighed the sentencing factors by sentencing Brumfield to a sentence that was twice Esteves's for the same count. None have merit.

First, as explained above, the district court did not err in rejecting Brumfield's argument that he was a minor participant in the conspiracy. His argument fares no better here. Second, the district court did not unduly rely on Brumfield's comment about Trochez before the robbery. Rather, it mentioned the comment as one of the many reasons it did not believe that Brumfield was remorseful. True, Brumfield was sentenced to more time than Esteves on the conspiracy count; Esteves received 120 months and Brumfield received 240. But in total, Esteves was sentenced to 600 months (for all three counts), while Brumfield was sentenced to 240 months. Disagreement with how the district court weighed the various sentencing factors cannot rebut a presumption of unreasonableness.[75]

---

[73] *Gaspar-Felipe*, 4 F.4th at 344.

[74] *United States v. Willis*, 76 F.4th 467, 477 (5th Cir. 2023) (quoting *United States v. Hernandez*, 876 F.3d 161, 166 (5th Cir. 2017)).

[75] *See United States v. Camero-Renobato*, 670 F.3d 633, 636 (5th Cir. 2012).

Brumfield has not rebutted the presumption that his sentence was reasonable. We find no error.

## III

In sum, Brumfield is not entitled to a new trial. Brumfield's *Brady* claim fails because the new evidence was not material as to him. His *Napue* claim fails because he has not shown that the Government presented materially false testimony. And his challenge to his sentence fails because the district court did not procedurally or substantively err in sentencing him.

But Esteves's claim warrants further consideration. We conclude that the undisclosed evidence was material as to him, so the district court must consider whether he has satisfied the other elements of his claim.

We therefore AFFIRM IN PART, REVERSE IN PART, and REMAND to the district court for further consideration of Esteves's *Brady* claim.