# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 20, 2026

Lyle W. Cayce
Clerk

No. 25-40247

RICHARD ANTHONY HEROD,

*Plaintiff—Appellee*,

*versus*

ERIC GUERRERO, *Director, Texas Department of Criminal Justice, Correctional Institutions Division*,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 3:15-CV-338

Before RICHMAN, ENGELHARDT, and WILSON, *Circuit Judges*.
PER CURIAM:[*]

Appellee Richard Anthony Herod was convicted of aggravated sexual assault and aggravated robbery in Texas state court in 2012. At trial, the prosecution introduced expert testimony interpreting DNA evidence found at the crime scene. The expert testified that Herod could not be excluded as a contributor to the DNA mixture found on one item at the scene—a white

---

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

t-shirt used to blindfold one of the victims. Several years later, the Texas Department of Public Safety ("DPS") issued a supplementary report stating that Herod was excluded as a contributor to that DNA mixture under updated interpretation protocols. Finding constitutional errors under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264 (1959), the district court granted Herod federal habeas relief under 28 U.S.C. § 2254. *See Herod v. Guerrero*, No. 15-0338, 2025 WL 1001609 (S.D. Tex. Apr. 3, 2025). We conclude Herod's claims were procedurally defaulted in state court and he has failed to show prejudice to overcome the default. We REVERSE the district court's judgment and REMAND for proceedings on the remainder of Herod's habeas petition.

I.

In January 2010, armed robbers invaded Alissia and Ronnie Gallagher's Texas City home. While inside the home, one of the robbers secured codeine and cash from Ronnie, bound his hands with zip ties, blindfolded him with a white t-shirt, and then proceeded to sexually assault Alissia in view of the couple's two children. In addition to other evidence, the state introduced expert DNA testimony at trial. Clare Browder, a DPS analyst, testified that Herod was excluded as a contributor to DNA mixtures found on almost all the physical evidence left at the scene. For the white t-shirt, Browder opined that Herod could not be excluded as a contributor. The defense called its own expert, who agreed that Herod could not be excluded (as a technical matter) from the DNA mixture found on the t-shirt.[1]

---

[1] The defense's expert, Melva Ketchum, also testified that Herod "should be excluded." Herod emphasizes that her testimony was impeached by her training in veterinary medicine, running of an unaccredited laboratory, and involvement "in the DNA quest for Bigfoot."

No. 25-40247

The jury convicted Herod of aggravated robbery and aggravated sexual assault. *Herod*, 2025 WL 1001609, at *1. Sentenced to 99 years in prison, Herod appealed his conviction and sentence through the state court system. *Id.* He then filed an initial state habeas petition in February 2015, which was denied by both the state trial court and the Texas Court of Criminal Appeals ("CCA"). *Id.*

Herod filed his first federal habeas petition in December 2015. *Id.* While that petition was pending, Herod received a letter from the state district attorney instructing that recalculation of DNA evidence was available in his case. DPS issued a supplemental report in 2017, explaining that Herod was excluded from all DNA evidence, including the mixture on the white t-shirt. The district court stayed proceedings so Herod could file a second state habeas petition asserting claims based on the DPS report. *Id.* The state trial court entered findings of fact and conclusions of law rejecting Herod's claims, and the CCA dismissed the application on procedural grounds. *Id.*

In January 2020, Herod returned to federal court with an amended habeas petition, raising nine claims for relief. *Id.* at *2. Herod's first claim alleged due process violations, encompassing both *Brady* and *Napue* arguments. He asserted that the state suppressed (1) the fact that Herod was excluded as a contributor to the DNA on the white t-shirt; and (2) the existence of scientific debate surrounding the state's method of DNA mixture interpretation. He likewise asserted the state's expert—Browder—falsely testified that "Herod could not be excluded as a contributor of the DNA found on the white shirt," this was "the strongest language you could use in a mixture case," and "[t]here's no difficulty with the statistics."

The district court concluded that Herod had overcome the procedural default of his *Brady* and *Napue* claims. It reached the merits, holding Herod

3

was entitled to § 2254 relief on both fronts. *Id.* at *22, 27. "In reviewing a grant of habeas relief, we review issues of law *de novo* and findings of fact for clear error." *Prible v. Lumpkin*, 43 F.4th 501, 513 (5th Cir. 2022). And we apply "the same standards to the state court's decision as did the district court." *Grace v. Hooper*, 123 F.4th 800, 804 (5th Cir. 2024) (citation modified).

## II.

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), the federal courts "shall entertain an application for a writ of habeas corpus" for a person in custody under a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2254(a). AEDPA ordinarily requires highly deferential review of the state court's habeas decision. *See id.* § 2254(d). These deferential review standards do not apply, though, when the claims were "not adjudicated on the merits in the state court." *Nelson v. Davis*, 952 F.3d 651, 658 (5th Cir. 2020) (citation modified). In that case—a procedural default—federal courts cannot review the claims "absent a showing of cause and prejudice to excuse the default." *Prible*, 43 F.4th at 513.

Cause is "some objective factor external to the defense" that "impeded counsel's efforts to raise the claim in state court." *Id.* at 513 (quoting *Canales v. Stephens*, 765 F.3d 551, 562 (5th Cir. 2014)). Prejudice means that "the errors 'worked to [the petitioner's] actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Id.* at 514 (quoting *Smith v. Quarterman*, 515 F.3d 392, 403 (5th Cir. 2008)). The "possibility of prejudice" is insufficient. *Hughes v. Quarterman*, 530 F.3d 336, 341 (5th Cir. 2008) (citation modified). A petitioner must show "pervasive actual prejudice," meaning that he "was

denied fundamental fairness at trial." *Murray v. Carrier*, 477 U.S. 478, 494 (1986) (citation modified). *Brady* violations "can provide cause and prejudice" to excuse the procedural bar. *Prible*, 43 F.4th at 514 (citation modified). *Brady*'s suppression element tracks cause, while its materiality element tracks prejudice. *Id.*

The parties here agree that Herod's claims are procedurally defaulted. After all, the CCA dismissed Herod's second habeas petition on state procedural grounds. *See Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997) (en banc) ("In our writ jurisprudence, a 'denial' signifies that we addressed and rejected the merits of a particular claim while a 'dismissal' means that we declined to consider the claim for reasons unrelated to the claim's merits."). And at all stages of this case, the government has conceded cause. Prejudice, however, it vigorously disputes. The district court ultimately agreed with Herod, concluding "Browder's false testimony . . . worked to Herod's actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Herod*, 2025 WL 1001609, at *21. We review the district court's cause-and-prejudice conclusion *de novo*. *Prible*, 43 F.4th at 513.

Recall that Herod's due process claim is premised on *Brady* and *Napue* violations. To assess whether the purportedly suppressed evidence and false testimony affronted procedural fairness, an outline of the trial evidence is in order. We evaluate the materiality of allegedly suppressed evidence "collectively, not item by item." *Floyd v. Vannoy*, 894 F.3d 143, 162 (5th Cir. 2018) (per curiam) (citation modified) (assessing *Brady* materiality). This is "not a sufficiency of the evidence test." *United States v. Brumfield*, 89 F.4th 506, 516 (5th Cir. 2023) (citation modified). Instead, we question whether Herod "received a fair trial"—one "resulting in a verdict worthy of confidence in the absence of the favorable evidence." *LaCaze v. Warden La. Corr. Inst. for Women*, 645 F.3d 728, 736 (5th Cir. 2011) (citation modified).

In its opening statement, the prosecution explained that the jury would hear "that [Herod's] DNA profile was present" on the white t-shirt used to blindfold Ronnie Gallagher. But that is not what the jury ultimately heard. Browder testified that Herod was excluded as a contributor to all but the white t-shirt. He "could not [be] exclude[d]" from the t-shirt's DNA mixture. On cross-examination, Browder testified that she could not "give . . . certainty" to any inclusion of one person within a mixture of DNA. She clarified on redirect, however, that Herod's non-exclusion was the "strongest language" she could use. Browder never testified that Herod's DNA was on the white t-shirt.

Despite Herod's non-exclusion, Browder testified to the "probability that you could pick up [a person] with that combination of alleles" as 1 in 87 Caucasians. She explained that the higher the second number, the "less frequent allele combination." Approximately 1 in 87 Caucasians would have the allele combination from which Herod could not be excluded. By comparison, Ronnie—who wore the t-shirt blindfold—could not be excluded at 14 of 16 locations on the body of the white t-shirt. For his allele combination, the probabilities of selecting a person at random who could be the contributor were 1 in 9.843 million for Caucasians, 1 in 102.5 million for African Americans, and 1 in 1.786 million for Hispanics.

The defense expert then cast some doubt on Herod's non-exclusion. Ketchum testified that Herod could "[t]echnically" not "be excluded from eight" of 16 allele markers. But she "[r]ealistically" felt "he should be excluded" from the t-shirt, given that he was excluded at the remaining eight markers. She further explained that he should have been excluded at five additional markers, given that some of the alleles were shared by Herod and the victims and other alleles were commonly found in large portions of the world population. Ketchum also emphasized the presence of an unknown contributor in the DNA mixture—it was four contributors, not three.

In closing, the prosecutor argued "we know the defendant's DNA could not be excluded. And that's as much as you can ever say about DNA. The rest are statistics." The prosecutor also argued that "DNA is better than a fingerprint. It's your genetic fingerprint. And the defendant's DNA is absolutely right there on that blindfold." The defense closing argument, though, undercut the weight of the DNA testimony. It urged the jury to consider Ketchum's expert testimony that, in her opinion, Herod's non-exclusion should only have extended to three, not eight, allele markers. Defense counsel also explained the possibility that the DNA was contributed by an African American or Hispanic male, while Herod was Caucasian— there was a further "chance of error." As the defense attorney noted, Browder testified to "a 1 in 87 chance" of another Caucasian person "being able to contribute this DNA." All in all, defense counsel emphasized, "even at the State's numbers," Herod was a risky bet, given that relatively high probability.

Disclosing the "fact" that Herod was actually excluded as a contributor to the mixture on the white t-shirt, the existence of scientific debate surrounding Browder's DNA interpretation methods, and that perhaps there was some "difficulty with the statistics" could not reasonably have moved the jury's needle. The jury had heard already from the defense expert that—setting aside technicalities—Herod should have been excluded from the DNA mixture. The jury had heard the defense expert cast doubt on Browder's statistics by highlighting that there was an unknown contributor to the sample. And the jury had heard that, for the single piece of evidence from which Herod could not be excluded, the allele combination probably could be found in 1 in 87 Caucasians. In other words, the chances that Herod contributed DNA to the mixture were a long shot. We independently agree with the state habeas trial court's conclusion that Herod

was "only minimally connected" to "the white shirt," even under the allegedly erroneous evidence.

The immateriality of the allegedly suppressed evidence and falsified testimony is further explained by the other evidence presented by the state. *Rocha v. Thaler*, 619 F.3d 387, 396 (5th Cir. 2010) ("The materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state." (citation modified)). At trial, Ronnie identified Herod as one of the robbers, and Alissia identified the "white male" as her assailant. Herod's girlfriend, Holly Kelly, testified for the prosecution, explaining that she drove Herod and another individual from Santa Fe, Texas, to Texas City, Texas, on the night of the crime, watched them take "beanies" and handguns out of the vehicle, and return later with codeine and several hundred dollars in cash. For his part, Herod introduced alibi testimony from his mother, stepfather, and brother. He was at his mother's home on the night of the crime watching the college football national championship. The defense also emphasized inconsistencies in the testimony elicited by the prosecution, including information the Gallaghers withheld in their original statements to police.

Importantly, cell phone evidence also tied Herod to the crime. Kelly testified that Herod had multiple phones around the time of the incident. To be sure, two phones were found in the truck that Herod was driving on the day of his arrest, although Kelly testified that she had left her cell phone in the vehicle as well. Alissia testified that she received two calls the morning after the crime, identifying the voice on the other end as her assailant's—the "white robber." After recovering the phones from Herod's truck, a Texas City Police detective discovered one of those phones had called Alissia at her reported time, confirmed by records from the cell provider. The phone that

8

called Alissia was not registered in Herod's name.[2]  Cell tower records reflected that one of the phones was in Santa Fe on the night of the crime until around 11:00 P.M.  That phone then traveled from Santa Fe to Texas City, returning to Santa Fe around 12:00 A.M.  The timing of the phone's travel between the cities aligns with the timing of the crime at the Gallaghers' Texas City home and Kelly's testimony about driving Herod from Santa Fe to Texas City.

Contrary to the district court's analysis, we conclude there is no "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Miller v. Dretke*, 404 F.3d 908, 914 (5th Cir. 2005) (citation modified) (concerning *Brady* materiality).  Although the defense challenged the state's other evidence of guilt, the allegedly suppressed evidence and falsified testimony does not "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).  The DNA evidence had limited import—which was further reduced by Ketchum's testimony and defense counsel's closing argument.  Neither the allegedly suppressed scientific evidence (supporting Herod's *Brady* claim) nor Browder's allegedly false DNA-related testimony (supporting Herod's *Napue* claim) infected Herod's "entire trial with error of constitutional dimensions." *See Prible*, 43 F.4th at 514 (explaining petitioner's burden to overcome

---

[2] Herod and the district court both emphasized oddities with the cell phones. *See Herod*, 2025 WL 1001609, at *5.  The phone that called Alissia was registered just 11 days after Alissia's phone registration, to someone listing the same address (a California P.O. box), with the same account holder birthday (02/19/1991), and the same recovery phone number.  Some of this information was not presented to the jury—and therefore is part of the basis for Herod's ineffective assistance of counsel claims. *See id.* at *20 ("Although not presented by Herod's counsel, evidence in the trial record showed that the x1537 phone had multiple unexplained similarities to Alissia Gallagher's phone.").

procedural default).  Herod has not shown prejudice sufficient to overcome the procedural bar.

\*        \*        \*

We REVERSE the district court's grant of 28 U.S.C. § 2254 habeas relief premised on Herod's *Brady* and *Napue* claims and REMAND for proceedings consistent with this opinion.

No. 25-40247

Kᴜʀᴛ D. Eɴɢᴇʟʜᴀʀᴅᴛ, *Circuit Judge*, joined by Wɪʟsᴏɴ, *Circuit Judge*, concurring:

I agree entirely with the majority opinion. I write separately to emphasize another reason why one of Herod's *Brady* arguments fails. Even if Herod had overcome the procedural default, one of his claims is barred by the non-retroactivity principle in *Teague v. Lane*, 489 U.S. 288 (1989).

\* \* \*

*Teague* prohibits federal habeas courts from applying "new constitutional rules of criminal procedure" to convictions and sentences finalized "before the new rules are announced." 489 U.S. at 310. This non-retroactivity rule, much like the procedural default bar, is a "threshold question in every habeas case." *Matthew v. Johnson*, 201 F.3d 353, 358–59 (5th Cir. 2000) (citation modified); *Lambrix v. Singletary*, 520 U.S. 518, 524 (1997) (recognizing that *Teague*-bar analysis may follow procedural-bar analysis but precedes the merits). Courts must assess "whether granting [petitioner] the relief he seeks would *create* a new rule of constitutional law." *Graham v. Collins*, 506 U.S. 461, 466 (1993) (emphasis added) (citation modified); *id.* at 467 ("New rules will not be applied or *announced* in cases on collateral review unless they fall into one of two exceptions." (emphasis added) (citation modified)).

The *Teague* analysis, largely unaddressed in the parties' briefing,[1] proceeds in three steps: First, identifying the date on which Herod's

---

[1] The state raised *Teague* for the first time on appeal. Herod asks the court to deem any *Teague* arguments waived. True, the state "may waive the *Teague* bar implicitly by failing to raise it." *Blakenship v. Johnson*, 118 F.3d 312, 316 (5th Cir. 1997) (recognizing that *Teague* is not an unwaivable jurisdictional doctrine). But "absent compelling reasons to the contrary," the court must "apply *Teague* even when it has been implicitly waived by the State" by raising it anew on appeal. *Jackson v. Johnson*, 217 F.3d 360, 361 (5th Cir. 2000); *Jones v. Davis*, 890 F.3d 559, 564 (5th Cir. 2018). Herod has provided no compelling

No. 25-40247

conviction and sentence were finalized. *Matthew*, 201 F.3d at 359. Second, "surveying the legal landscape as it then existed" and assessing whether the "rule he seeks was required by the Constitution" at the time. *Id.* (citation modified). And, third, if a new rule is needed, whether it falls within either of two narrow exceptions to *Teague*'s non-retroactivity bar. *Id.*

## I.

A "conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied." *Caspari v. Bohlen*, 510 U.S. 383, 390 (1994). Herod's conviction and sentence were finalized in June 2014. *Herod v. Guerrero*, No. 15-0338, 2025 WL 1001609, at *1 (S.D. Tex. Apr. 3, 2025) (district court explaining that Texas Court of Criminal Appeals denied Herod's petition for discretionary review on March 12, 2014); Sup. Ct. R. 13 (requiring petitions for certiorari in criminal cases to be filed within 90 days of state court order denying discretionary review).

## II.

An assessment of the legal landscape in June 2014 reveals that Herod's *Brady*-based relief partially requires new constitutional rules. For one of his *Brady* claims, "it would have been anything but clear to reasonable jurists" that Herod's trial violated the Constitution, as he alleges. *Graham*, 506 U.S. at 468. New rules "break[] new ground, impose[] a new obligation on the states or the federal government, or [were] not dictated by precedent existing at the time the defendant's conviction became final." *Hughes v. Dretke*, 412 F.3d 582, 591 (5th Cir. 2005). "Dictated by precedent means

_____

reasons not to assess *Teague* and asserted at oral argument only that his claims break no new constitutional ground.

that no other interpretation was reasonable." *United States v. London*, 937 F.3d 502, 507 (5th Cir. 2019) (citation modified); *Lambrix*, 520 U.S. at 538. "Unless reasonable jurists hearing the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review." *Hughes*, 412 F.3d at 591. Note, however, that "when all we do is apply a general standard to the kind of factual circumstances it was meant to address, we will rarely state a new rule for *Teague* purposes." *Chaidez v. United States*, 568 U.S. 342, 348 (2013).

Herod's *Brady* arguments allege the prosecution's failure to disclose impeachment evidence. Prosecutorial disclosure obligations for exculpatory evidence have existed since at least the 1960s. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). And the rule has long extended to impeachment material as well. *See Matthew*, 201 F.3d at 360 (first citing *United States v. Bagley*, 473 U.S. 667, 676 (1985); and then citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)). For decades, three elements have made up a *Brady* violation: "(1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material to his guilt or punishment." *Cobb v. Thaler*, 682 F.3d 364, 377 (5th Cir. 2012) (internal quotation marks and citation omitted). Herod argues the state failed to disclose (1) the fact that Herod was excluded as a DNA contributor to the white t-shirt and (2) scientific debate surrounding the state's DNA mixture interpretation method.

*Brady* would not require the state to disclose a fact that it had no knowledge of at the time of trial. No evidence showed Herod's exclusion until 2017, when the state reevaluated the DNA mixture using updated interpretation protocols. Herod does not identify a single person or document, from before or during trial, that suggests the prosecution knew or believed Herod was excluded as a contributor. "*Brady* claims involve the

discovery, after trial, of information which had been *known* to the prosecution but unknown to the defense." *West v. Johnson*, 92 F.3d 1385, 1399 (5th Cir. 1996) (emphasis added) (citation modified); *see also* Caitlin Plummer & Imran Syed, *"Shifted Science" and Post-Conviction Relief*, 8 Stan. J. C.R. & C.L. 259, 285 (2012) (recognizing that *Brady* claim necessarily fails in "the case of true shifted science" because "a prosecutor cannot disclose something that she does not know and cannot be expected to know"). Herod cites no authority suggesting that the prosecution suppresses a fact absent evidence the prosecution even knew about it. The court would "have to extend *Brady* beyond what is compelled by existing precedent" to rule in Herod's favor. *West*, 92 F.3d at 1399. Therefore, relief is "barred by *Teague*." *Id.*

Herod's other *Brady* argument—that the state suppressed scientific debate surrounding its chosen DNA mixture interpretation method—is likely not barred by *Teague*. Herod asks the court to conclude this was not the type of information that was "in the public domain" at the time of trial, such that it was equally available to the defense. "Evidence is not suppressed if the defendant knows or should know of the essential facts that would enable him to take advantage of it." *United States v. Runyan*, 290 F.3d 223, 246 (5th Cir. 2002) (citation modified); *id.* (explaining prosecution need not "facilitate the compilation of exculpatory material that, with some industry, defense counsel could marshal on their own" (citation modified)). I doubt relief would be warranted on the merits of this *Brady* argument.[2] But Herod

---

[2] Although some cases explain that if "reasonable minds could differ on whether the current law requires relief, we may not grant relief without creating a 'new rule' barred by *Teague*," *Vega v. Johnson*, 149 F.3d 354, 357 (5th Cir. 1998), the Supreme Court has clarified that *Teague* is separate from a merits analysis, *see Lambrix*, 520 U.S. at 524. Necessarily, then, failure on the merits cannot automatically make such a claim *Teague-*

merely asks the court to apply rules of "general application," "designed for the specific purpose of evaluating a myriad of factual contexts." *Chaidez*, 568 U.S. at 348 (citation modified). Legal principles from those cases "speak directly" to the issues he raises. *See Saffle v. Parks*, 494 U.S. 484, 490 (1990) (addressing situation where the existing cases did not "speak directly, if at all, to the issue presented"). The starting point of Herod's argument is "a rule of general application," so it likely is not "so novel that it forges a new rule." *Chaidez*, 568 U.S. at 348 (internal quotation marks and citation omitted). *But see Graham*, 506 U.S. at 477 ("We cannot say that all reasonable jurists would have deemed themselves compelled to accept Graham's claim in 1984. . . . The ruling Graham seeks, therefore, would be a 'new rule' under *Teague*.").

## III.

Two exceptions permit the court to apply new rules to old convictions, but neither aids Herod here.

"The first exception applies to those rules that place certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." *Gilmore v. Taylor*, 508 U.S. 333, 345 (1993) (citation modified). This encompasses rules that decriminalize classes of conduct or prohibit types of punishment for groups of people. *See Saffle*, 494 U.S. at 495. That is plainly not the situation presented here.

The second exception "permits the retroactive application of watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Gilmore*, 508 U.S. at 345 (citation modified). This exception encompasses only a "*small core* of rules requiring

---

barred. Articulating *Teague*'s precise contours in a situation like this, however, is an academic exercise beyond the purview of this concurrence.

observance of those procedures" that are "implicit in the concept of ordered liberty." *Id.* (emphasis added) (citation modified). The Supreme Court has limited this exception to "those new procedures without which the likelihood of an accurate conviction is seriously diminished," *Matthew*, 201 F.3d at 369 (quoting *Teague*, 489 U.S. at 313), and that "alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding," *Whorton v. Bockting*, 549 U.S. 406, 418 (2007) (citation modified). "Although the precise contours of this exception may be difficult to discern," the paradigmatic example is the rule from *Gideon v. Wainwright*, 372 U.S. 335 (1963), guaranteeing representation of counsel in criminal trials. *Saffle*, 494 U.S. at 495. "When a defendant who wishes to be represented by counsel is denied representation, . . . the risk of an unreliable verdict is intolerably high." *Whorton*, 549 U.S. at 419. Even if valid, the new *Brady* rule that Herod asks the court to employ has "none of the primacy and centrality of the rule adopted in *Gideon*." *Saffle*, 494 U.S. at 495; *Edwards v. Vannoy*, 593 U.S. 255, 264 (2021) (noting that the Supreme Court has "*never* found that any new procedural rule" satisfies the second exception). Neither *Teague* exception applies.

\* \* \*

I concur in the panel opinion's conclusion that Herod has failed to show prejudice to overcome the procedural default. But even if he had shown prejudice, one of his *Brady* arguments requires the court to break new constitutional ground. The federal courts are barred from doing so on collateral review.